**RAY ANGELINI, INC.**

v.

**CITY OF PHILADELPHIA, et al.**

Civil Action No. 96–3200.

United States District Court,
E.D. Pennsylvania.

Nov. 24, 1997.

Louis J. Sinatra, Kaplin, Stewart, Meloff, Reiter and Stein, P.C., Blue Bell, PA, James E. Miller, Pelino & Lentz, Philadelphia, PA, Michael Araten, Lesser and Kaplin, P.C., Blue Bell, PA, for Ray Angelini, Inc.

Christopher I. McCabe, Michael F. Eichert, City of Philadelphia Law Dept., Philadelphia, PA, for Edward G. Rendell, David L. Cohen, Louis Applebaum, Gerald Murphy, Marla D. Neeson, James Coleman, Frances Egan, City of Philadelphia.

Richard B. Sigmond, Richard C. McNeill, Terence Coles, Sagot, Jennings and Sigmond, Philadelphia, PA, for Local Union 98 International Brotherhood of Electrical Workers.

## MEMORANDUM FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROBERT F. KELLY, District Judge.

This is an action instituted by Plaintiff Ray Angelini, Inc. ("Angelini" or "Company"), against the City of Philadelphia ("City") and certain officials of the City (collectively, "City Defendants" or "City") and Local Union 98 of the International Brotherhood of Electrical Workers ("Local 98") for allegedly depriving Angelini of its constitutionally protected liberty interests under 42 U.S.C. § 1983. The City officials and individual Defendants in this case are: Mayor Edward G. Rendell ("Rendell"); his former Chief of Staff, David L. Cohen ("Cohen"); Louis Applebaum ("Applebaum"), the Commissioner of Procurement for the City; Marla D. Neeson ("Neeson"), Applebaum's Deputy Procurement Commissioner; Gerald Murphy ("Murphy"), Deputy Mayor of Labor for the City; James Coleman ("Coleman"), Deputy Managing Director of the City; Frances Egan ("Egan"), presently Commissioner of the Department of Licenses and Inspections and a former Deputy Managing Director of the City.

Angelini is a construction company engaged in performing work as an electrical and general contractor in Pennsylvania, New Jersey and Delaware. Approximately 80–90% of Angelini's work is in the public sector.

Angelini has been in business for over 20 years; and is an open-shop contractor (meaning that it has no formal contracts with local labor unions). This action arises from a construction project undertaken by the City at the Philadelphia International Airport ("Airport"). Angelini submitted a bid on Bid 6551 in the amount of $6,778,000 and was the apparent low bidder on the project. The second lowest bidder was Lombardo and Lite, Inc. ("Lombardo and Lite"), a unionized electrical contractor, whose bid price was $7,372,000. In January 1996, Local 98 complained to City officials that Angelini was not a responsible bidder. An investigation was conducted, as a result, on February 2, 1996 Angelini was notified that it had been disqualified from Bid 6551.

After pursuing administrative remedies which were denied, Angelini initiated a State Court action seeking review of the administrative decision and injunctive relief. In March 1996, Angelini's request for preliminary injunction was denied and in April of the same year, the State Court action was discontinued and this suit was started in the Federal District Court.

In April 1996, the City solicited bids on two other projects at the Airport (hereinafter referred to as "Bids 6582 and 6583"). On April 25, 1996, the City's Procurement Department notified Angelini that it would not accept Angelini's bids on these projects, as a result of the February 13, 1996 determination that Angelini was not a responsible contractor.

Angelini requested, and was granted, a hearing on this disqualification by the City on May 7, 1996. The results of this hearing were that Angelini was determined to be a "responsible" bidder and was permitted to submit bids on Bids 6582 and 6583.

A hearing on Angelini's request for preliminary injunction was held on May 22, 23 and 24, 1996. On May 28, 1996, this Court denied Plaintiff's request for a preliminary injunction.

A non-jury trial was held on April 16, 17, 18, 21 and 28, 1997. The court notified the parties that under Fed.R.Civ.P. 65(a)(2) testimony from the 1996 injunction hearing would be considered as part of the trial testimony. From that testimony we make the following:

## FINDINGS OF FACT

1. Plaintiff Ray Angelini, Inc., is a non-union general and electrical contractor based in Sewell, New Jersey, and performs work principally in New Jersey, Pennsylvania, and Delaware. [N.T. 5/24/96, pp. 33–34, 35]

2. The City is a first-class City of the Commonwealth of Pennsylvania and is organized and existing pursuant to Pennsylvania laws and a Home Rule Charter.

3. Defendant Edward G. Rendell is the Mayor of the City of Philadelphia.

4. Defendant David L. Cohen was the Chief of Staff to Mayor Rendell from January 6, 1992 to April 4, 1997. [N.T. 4/28/97, pp. 3–4]

5. Defendant Frances Egan is the Commissioner of the City's Department of Licenses and Inspections, having been appointed to that position by Mayor Rendell in September 1996. [N.T. 4/16/97, p. 5]

6. Commissioner Egan was formerly a Deputy Managing Director from November 1992 to September 1996. [N.T. 4/16/97, p. 5]

7. Defendant James Coleman is a Deputy Managing Director and has held that position for the last five years. [N.T. 4/16/97, p. 46]

8. Defendant Maria Neeson is the Deputy Procurement Commissioner in charge of the City's service, supply, and equipment contracts. [N.T. 4/16/97, pp. 81–82]

9. At the time of the events in question, Deputy Commissioner Neeson was the Deputy Procurement Commissioner in charge of the City's public works contracts. [N.T. 4/16/97, pp. 81–82]

10. Defendant Louis Applebaum is the Procurement Commissioner of the City of Philadelphia.

11. As Commissioner of Procurement, Commissioner Applebaum is in charge of the City department which oversees the bidding process with respect to obtaining for City contracts the lowest responsive and responsible bidders. [N.T. 5/23/96, p. 118]

12. Prior to Commissioner Applebaum being appointed to his City position, Commissioner Applebaum was, from the mid-70s to 1988, the owner of A. Pomerantz & Company, an office products and office furniture company [N.T. 4/21/97, at pp. 25–27]

13. When Commissioner Applebaum was appointed to the position of Procurement Commissioner, Commissioner Applebaum was never instructed as to how to treat contractors who had collective bargaining agreements with labor unions. [N.T. 4/21/97, at p. 27]

14. Defendant Gerald A. Murphy is the City's Deputy Mayor for Labor and has been so for the last five years. [N.T. 5/22/96, at p. 56]

15. Mr. Murphy's duties as Deputy Mayor include overseeing the Labor Standards Unit which monitors the payment of prevailing wages on the City public works projects. [N.T. 5/22/96, p. 60]

16. Angelini was pre-qualified by the Division of Aviation and the Procurement Department to submit a bid to the City on Bid No. 6551 for the Philadelphia International Airport's Terminal B/C Improvements Project—Package 3. [N.T. 4/16/97, at p. 87; N.T. 4/21/97, at p. 13; Exhibit P–54]

17. On December 20, 1995, the City opened bids for the electrical contracting work (Bid No. 6551) for the Philadelphia International Airport's Terminal B/C Improvements Project—Package 3.

18. On January 5, 1996, John Dougherty, business manager of Local 98, called Chief of Staff Cohen, but did not speak personally with him. [Exhibit P–1]

19. On January 5, 1996, Chief of Staff Cohen wrote a memo to Gerald Murphy, Deputy Mayor for Labor, requesting that Mr. Murphy return Mr. Dougherty's phone call. [Exhibit P–1]. When Mr. Murphy returned the call, he was advised by Mr. Dougherty that Angelini had prevailing wage violations [N.T. 5/22/96, pp. 68–69; N.T. 5/24/96, pp. 15–16]

20. Mr. Murphy asked Mr. Dougherty to get him the information that he had on Angelini regarding the prevailing wage violations. [N.T. 5/22/96, p. 76; N.T. 5/24/96, p. 18]

21. On January 12, 1996, after his phone call with Mr. Dougherty, Mr. Murphy wrote a memo to Chief of Staff Cohen regarding the substance of the phone call. In this memo, Mr. Murphy outlined the facts, listing the various concerns which Local 98 had about Angelini's bid and its bidder status. [Exhibit P–2]

22. On or about January 19, 1996, Local 98 delivered to the City at various locations, including the Mayor's office and Mr. Murphy's office, a "book" which collected a variety of information relating to Angelini's bid and its bidder status. [Exhibit P–18; N.T. 5/24/96, p. 24; N.T. 5/22/96, pp. 115–116]

23. On January 19, 1996, Mr. Murphy again wrote to Chief of Staff Cohen to provide him with an update on the status of his investigation into the complaints that Local 98 had made about Angelini. [Exhibit P–7]

24. As of January 19, 1996, Mr. Murphy had not yet received information sufficient to warrant a recommendation in favor of a disqualification of Angelini.

25. On January 22, 1996, Mr. Murphy wrote to the State of New Jersey's Department of Labor requesting information on Angelini's wage violations. [Exhibit P–10]

26. On January 23, 1996, the State of New Jersey's Department of Labor (NJDOL) replied by letter to Mr. Murphy's letter and stated that the NJDOL had three previous files regarding prevailing wage violations by Angelini over the past five years. [Exhibit P–10]

27. On January 25, 1996, Mr. Murphy wrote to the NJDOL requesting additional detailed information on Angelini's three New Jersey prevailing wage violations. [Exhibit P–11]

28. On January 26, 1996, Mr. Murphy wrote a memo to Chief of Staff Cohen in order to update him on his investigation into the concerns that had been raised about Angelini. Mr. Murphy stated that he was still waiting to hear back from the NJDOL regarding more detail on Angelini's three New

Jersey prevailing wage violations. [Exhibit P–13]

29. On January 26, 1996, the NJDOL replied by letter to Mr. Murphy's letter regarding Angelini's previous prevailing wage violations and stated that the amounts paid by Angelini were $598.13 in 1991, $14,808.39 in 1993, and $314.48 in 1995. [Exhibit P–12]

30. At some time during the last week of January 1996, Mr. Murphy had a discussion with Commissioner Applebaum concerning the status of his investigation into Angelini. At that time, Mr. Murphy informed Commissioner Applebaum orally that he was recommending that Angelini be disqualified. [N.T. 5/22/96, p. 167; N.T. 5/23/97, pp. 211–212]

31. Commissioner Applebaum requested that Mr. Murphy prepare a memo in writing stating the reasons in support of his recommended disqualification of Angelini. [N.T. 5/22/96, p. 167; N.T. 5/23/97, pp. 211–212]

32. On January 31, 1996, a draft letter was prepared by Procurement advising Angelini of its disqualification on Bid No. 6551. [Exhibits P–22 and P–23]

33. On February 2, 1996, Mr. Murphy prepared a memo to Commissioner Applebaum, wherein Mr. Murphy recommended that Angelini be disqualified on account of the three New Jersey prevailing wage violations. Mr. Murphy stated in his memo that he believed "it to be in the best interest of the City to award this contract to the next lowest responsive responsible bidder." [Exhibit P–14]

34. The February 2, 1996 memo was Mr. Murphy's first official recommendation that Angelini be disqualified. [N.T. 5/22/96, p. 118]

35. Mr. Murphy had his February 2, 1996 memo reviewed by the City Solicitor's Office before submitting it to Commissioner Applebaum. [N.T. 5/22/96, p. 167]

36. Mr. Murphy did not discuss Angelini with Councilman Kenney, and Mr. Murphy's recommendation that Angelini be disqualified was not influenced in any way by Councilman Kenney. [N.T. 5/22/96, pp. 162–163]

37. Mr. Murphy's recommendation that Angelini be disqualified was not influenced in any way by Chief of Staff Cohen. [N.T. 5/22/96, p. 163]

38. Mr. Murphy did not discuss Angelini with Mayor Rendell, and Mr. Murphy's recommendation that Angelini be disqualified was not influenced in any way by Mayor Rendell. [N.T. 5/22/96, pp. 163–164]

39. Commissioner Applebaum was free to accept or reject Mr. Murphy's recommendation that Angelini be disqualified. [N.T. 5/23/96, p. 213]

40. On February 2, 1996, the Procurement Department notified Angelini that it was being disqualified from receiving an award of contract on Bid No. 6551.

41. The Philadelphia Code allows the Procurement Department to disqualify a bidder prior to the award of a contract, but after the opening of bids, if the Procurement Department obtains information which in its opinion adversely affects the responsibility of the bidder. [Exhibit P–42]

42. The decision of the Procurement Department to disqualify Angelini was made by Commissioner Applebaum and Ms. Neeson and was the result of information that was supplied to them by Mr. Murphy. [N.T. 4/16/97, p. 116]

43. Mayor Rendell did not give any direction to Mr. Murphy in his investigation of Angelini. [N.T. 4/28/97, p. 19]

44. Neither Mayor Rendell nor Chief of Staff Cohen, nor any one else in the Mayor's Office, gave any instruction to Commissioner Applebaum in how to proceed with respect to Angelini or Bid No. 6551. [N.T. 4/28/97, p. 20]

45. In accepting Mr. Murphy's recommendation and in deciding to disqualify Angelini on Bid No. 6551, Commissioner Applebaum was not influenced by Mayor Rendell or Chief of Staff Cohen in any way. [N.T. 5/23/96, p. 203]

46. Local 98 never obtained a copy of Angelini's financial statements. [N.T. 4/16/97, p. 178]

47. Thereafter, on February 13, 1996, an on-the-record evidentiary hearing was held on Angelini's appeal from its disqualification

on Bid No. 6551. the panel members included Commissioner Applebaum, and Mr. Coleman, and Commissioner Egan. [Exhibit P–40]

48. At the hearing, the panel members were represented by counsel from the City Solicitor's Office. [N.T. 4/16/97, p. 32]

49. Both Mr. Coleman and Commissioner Egan were selected at random by the Managing Director's Office through a routine procedure. [N.T. 4/16/97, pp. 28,59]

50. There was no City policy or specific reason which resulted in Commissioner Egan herself in particular being asked to sit on the hearing panel. [N.T. 4/16/97, pp. 30–32]

51. Prior to the hearing, Commissioner Egan did not know the nature of the hearing, the name of the contractor involved, whether the contractor was union or non-union, or the nature of the project or bid in question. She was also not given any other information about the hearing except when to appear for the hearing. [N.T. 4/16/97, pp. 29–30]

52. Prior to the hearing, Commissioner Egan did not speak with Commissioner Applebaum or Chief of Staff Cohen or anyone from the Mayor's Office about the subject matter of the hearing. [N.T. 4/16/97, p. 30]

53. Prior to the hearing, Mr. Coleman did not know the nature of the hearing, the name of the contractor involved, or the nature of the issues in question. [N.T. 4/16/97, p. 60]

54. Prior to the hearing, Mr. Coleman did not have any discussions with anyone from the Mayor's Office concerning the hearing. [N.T. 4/16/97, p. 70]

55. Prior to the hearing, Commissioner Applebaum did speak with Chief of Staff Cohen about the hearing, and Chief of Staff Cohen advised Commissioner Applebaum to "do what you have to do." [N.T. 5/23/96, p. 155]

56. After the hearing concluded, the three panel members deliberated with both Ms. Neeson and counsel for the panel present. [N.T. 4/16/97, pp. 124–125; Exhibit P–40]

57. Ms. Neeson did not participate in the panel's deliberations and did not offer and was not requested to give any advice to the panel. Her only role was to memorialize the panel's decision. [N.T. 4/16/97, pp. 124–125]

58. The three panel members voted unanimously to uphold the disqualification of Angelini. [N.T. 4/16/97, p. 24]

59. Commissioner Egan voted first, then Mr. Coleman, and finally Commissioner Applebaum. [N.T. 4/16/97, p. 65]

60. No one indicated to Commissioner Egan, either directly or in any fashion how she was to cast her vote. [N.T. 4/16/97, p. 33]

61. Commissioner Applebaum did not indicate to Commissioner Egan, either by suggestion or expressly or in any way how he would like her to vote. [N.T. 4/16/97, p. 33]

62. Commissioner Egan was not aware of any City policy that would have influenced her vote, or of any City policy to disfavor non-union contractors in public works contracts. [N.T. 4/16/97, p. 33]

63. Commissioner Egan voted to uphold the disqualification because of Angelini's three New Jersey prevailing wage violations which in her mind were not disproven at the hearing. [N.T. 4/16/97, pp. 33–34]

64. Commissioner Egan was not promised any benefits or any thing of value in exchange for her vote. [N.T. 4/16/97, p. 34]

65. Commissioner Egan's promotion to the position of Commissioner of L & I was not the result of any vote that she cast at the hearing. [N.T. 4/16/97, p. 45]

66. Commissioner Applebaum did not indicate to Mr. Coleman, either expressly or by implication how he would like him to vote. [N.T. 4/16/97, p. 65]

67. In casting his vote, Mr. Coleman was acting independently of any outside influence. [N.T. 4/16/97, p. 65]

68. Mr. Coleman was not aware of any City policy to disfavor non-union bidders with respect to qualifications or disqualifications. [N.T. 4/16/97, pp. 67–68]

69. No one in City government indicated by suggestion or directly how Mr. Coleman's vote should be cast. [N.T. 4/16/97, p. 66]

70. Mr. Coleman voted to uphold the disqualification because he did not think that a

case was presented such that disqualification should be overruled. [N.T. 4/16/97, p. 66]

71. The non-union status of Angelini did not play any role in the casting of Mr. Coleman's vote, and did not play any role either at the hearing or during the deliberations. [N.T. 5/23/96, p. 208; N.T. 4/16/97, p. 68]

72. The panel discarded the evidence that was presented at the hearing with respect to Angelini's alleged prevailing wage violations on the Belmont Water Department project. [N.T. 4/16/97, p. 63; N.T. 4/21/97, pp. 34–35]

73. Mr. Coleman's decision was not influenced by any information presented at the hearing with respect to Angelini's alleged prevailing wage violations on the Belmont Water Department project. [N.T. 4/16/97, p. 60]

74. During the panel's deliberations after the hearing, Mr. Coleman asked counsel for the panel whether Angelini's uncontested prevailing wage violations were a basis for disqualification. [N.T. 4/16/97, pp. 60, 63–64]

75. Counsel's response to Mr. Coleman's inquiry was that Angelini's violations could form a basis for disqualification. [N.T. 4/16/97, p. 64]

76. Chief of Staff Cohen did not play any role whatsoever in the February 13 disqualification hearing. [N.T. 4/28/97, p. 25]

77. In casting his vote during the deliberations, Commissioner Applebaum was not influenced in any way by the wishes or directives of Mayor Rendell, Local 98, Chief of Staff Cohen, or any City Councilperson. [N.T. 5/23/96, p. 203]

78. On February 13, 1996, the City informed Angelini of the panel's decision to uphold the disqualification. [Exhibit P–27]

79. The City did not publish or disseminate the fact of or reasons for the disqualification of Angelini on Bid No. 6551 to anyone other than Angelini itself and certain City personnel. [N.T. 4/21/97, at pp. 19–20]

80. The City did not publicly announce the fact of or reasons for the disqualification of Angelini on Bid No. 6551. [N.T. 4/21/97, at p. 19]

81. The disqualification of Angelini on Bid No. 6551 was effective for that bid only. It did not prevent Angelini from seeking to be pre-qualified for future City bids. [N.T. 4/21/97, at p. 15]

82. Angelini was never placed on the City's "Problem Contractors' List." [N.T. 4/21/97, p. 17]

83. On February 16, 1996, Ms. Neeson prepared a memo to file detailing the reasons for the panel's decision to uphold the disqualification. [Exhibit P–28]

84. This memo details that Angelini's three New Jersey prevailing wage violations (which are uncontested by Angelini), and the panel's belief that Angelini had not adequately explained the reasons for these violations, formed the basis for the panel's decision to uphold the initial decision to disqualify Angelini. [N.T. 5/23/96, pp. 205–206; Exhibit P–28]

85. Prevailing wages are a part of all of the City's public works contracts, and there is a specific City Code section which details penalties for violations of the City's prevailing wage requirement. [N.T. 4/16/97, p. 123]

86. Prior to the City making a contract award to Lombardo & Lite, Inc., the second low bidder on Bid No. 6551, Mr. Murphy was asked to check into whether Lombardo had any prevailing wage violations. [N.T. 5/22/96, p. 141]

87. Thereafter, Mr. Murphy investigated whether Lombardo had a prevailing wage violation. Mr. Murphy determined that Lombardo was a responsible contractor based on his determination that Lombardo had a single prevailing wage violation dating to 1989. [N.T. 5/22/96, p. 130]

88. Mr. Murphy did not investigate further into Lombardo since no other information about Lombardo was brought to his attention. [N.T. 5/22/96, pp. 141–42]

89. On March 15, 1996, Roy S. Cohen, Angelini's lawyer, encountered Commissioner Applebaum in the City's underground concourse. [N.T. 5/22/96, pp. 190–91]

90. During their encounter, Commissioner Applebaum and attorney Cohen had a discussion relating to a press conference that

Angelini had threatened to hold with respect to its disqualification. [N.T. 5/22/96, pp. 191–92]

91. During the discussion, Commissioner Applebaum expressed to attorney Cohen that he was unhappy with the decision to disqualify Angelini and probably said that it was a shame that the City had to expend an additional $600,000. [N.T. 5/23/96, p. 195]

92. During the discussion, Commissioner Applebaum suggested to attorney Cohen that attorney Cohen could talk to the City's lawyers and that there could hopefully be an arrangement to remove the disqualification through an expungement, because in Commissioner Applebaum's view there was never any intention to hurt Angelini (or any other vendor that does business with the City). [N.T. 5/23/96, pp. 188–90, 218]

93. The discussion regarding expungement was not intended to result in making Angelini the qualified bidder and being awarded the contract. [N.T. 5/23/96, p. 199]

94. Commissioner Applebaum did not tell attorney Cohen that Mayor Rendell and Chief of Staff Cohen had collaborated with Local 98. [N.T. 4/21/97, p. 42]

95. Commissioner Applebaum has no knowledge of whether Local 98 ever helped Mayor Rendell politically in any respect. [N.T. 4/21/97, p. 47]

96. Chief of Staff Cohen never had a conversation with Commissioner Applebaum in which he expressed a view as to how he would feel if Angelini were to hold a press conference. [N.T. 4/16/97, pp. 245–46]

97. Chief of Staff Cohen had no discussions with Mayor Rendell as the Angelini disqualification process progressed. [N.T. 4/16/97, p. 246]

98. City Bid Nos. 6582 and 6583 concerned construction work that was to take place at the Northeast Philadelphia Airport and the Airport. [N.T. 4/16/97, p. 186]

99. On April 9, 1996, Angelini submitted pre-qualification statements for Bid Nos. 6582 and 6583. [Exhibits P–55 and P–58]

100. By letter dated April 25, 1996, the City notified Angelini that it was disqualified from submitting bids on Bid Nos. 6582 and 6583. [Exhibit P–37]

101. The City's Division of Aviation disqualified Angelini based on contact from Mr. Murphy. [N.T. 4/16/97, p. 186]

102. Because Angelini had been disqualified on Bid No. 6551, Jay Beratan of the Division of Aviation contacted Mr. Murphy in order to find out whether there were prevailing wage violations that would disqualify Angelini on Bid Nos. 6582 and 6583. [N.T. 4/16/97, pp. 191–192; Exhibits P–56 and P–57]

103. Submissions on these two bids were scheduled to be received and opened by the City on April 30, 1996. [N.T. 4/18/97, p. 115; Exhibit P–37]

104. According to Mr. Angelini, it was the practice of Angelini not to begin to prepare its bid estimates for projects until it knows that it is pre-qualified, lest the work expended in preparing the estimate becomes a waste of time for Angelini. [N.T. 4/18/97, p. 128]

105. Angelini appealed from its disqualification on Bids 6582 and 6583, and was thereafter afforded a full, on-the-record, evidentiary hearing on May 7, 1996 in order to contest its disqualification. At the hearing, Angelini's representative stated on the record that Angelini's bids could be prepared in "just a matter of days" if Angelini's disqualification was reversed. [P–41, p. 90]

106. After the hearing, the panel, which was of a different composition than the panel which heard Angelini's appeal on Bid No. 6551, Voted to reverse Angelini's disqualification on Bid Nos. 6582 and 6583. The reason for the reversal was that the evidence presented at the hearing was in the view of Commissioner Applebaum "very credible, very well thought out, [and] presented in much detail that allowed the panel to reach that decision." [N.T. 5/23/96, p. 161]

107. After the hearing, orally on May 7, 1996, and by letter dated May 8, 1996, the City advised Angelini that bids would be accepted from it on these two bids, in effect reversing its disqualification on Bids 6582 and 6583. [Exhibit P–38, P–60, and Exhibit P–73]

108. After the May 7, 1996 disqualification hearing, the bid opening date for Bid Nos. 6582 and 6583 was rescheduled for Friday, May 10, 1996, at 10:30 a.m., three days after notice was given to Angelini that it would be permitted to submit bids to the City. Thereafter, the bid opening date for Bid Nos. 6582 and 6583 was again rescheduled for Tuesday, May 14, 1996, at 2:39 p.m., seven days after notice was given to Angelini that it would be permitted to submit bids to the City. [Exhibit P–73 and P–74]

109. After its disqualification was reversed on Bid No. 6582 and 6583, Angelini did not submit any bids to the City for these two bids. [Final Joint Pretrial Order]

110. After its disqualification by the City on Bid No. 6551, Angelini submitted bids for public works contracts in New Jersey, Pennsylvania and Delaware. [Final Joint Pretrial Order]

111. Angelini has submitted nine bids for general construction work in New Jersey and Delaware, 46 bids for electrical construction work in New Jersey, Pennsylvania and Delaware, and 19 bids for miscellaneous construction work in New Jersey, Pennsylvania and Delaware. [Final Joint Pretrial Order]

112. In connection with its public bidding since its disqualification by the City, Angelini has not disclosed to any public or government agency or official its disqualification by the City on Bid No. 6551. [Final Joint Pretrial Order]

113. After February 13, 1996, with the exception of City of Philadelphia Bid Nos. 6582 and 6583 (where its disqualification was subsequently reversed by the City), Angelini has not been disqualified from submitting a bid on any public or government contract as a consequence of the City's disqualification of Angelini on Bid No. 6551. [Final Joint Pretrial Order]

114. Angelini has also not been disqualified from receiving an award of a public or government contract as a consequence of the City's disqualification of Angelini on Bid No. 6551. [Final Joint Pretrial Order]

115. After February 13, 1996, Angelini has been awarded two public contracts for general construction work with a total value of $10,816,625 and seven public contracts for electrical construction work with a total value of $10,440,508. [Final Joint Pretrial Order]

116. After February 13, 1996, Angelini has been awarded two additional public contracts for electrical construction work—the PATCO project and the Radnor H.S. project—with a total value of $9,537,667. [Exhibit D–9; N.T. 4/18/97, pp. 123–24]

117. The total value of public contracts awarded to Angelini after February 13, 1996, is $31,078,800. [Exhibit D–9]

118. Angelini's expert witness, Gordon Curtis, did not perform any analysis of Angelini's business operations in order to determine the capacity of Angelini to perform any specific volume of contracting work, such as, e.g., $50 million of work, and Mr. Curtis therefore could not state the capability of Angelini to undertake the allegedly lost work opportunities claimed by Angelini. [N.T. 4/18/97, p. 41]

119. Mr. Curtis could not name a single project which Angelini did not receive that it would have performed had its bonding capacity been increased. [N.T. 4/18/97, p. 42]

120. Since February 13, 1996, Angelini has never formally requested that its bonding capacity or limit be increased. [N.T. 4/17/97, p. 134]

121. The City has a policy expressed in Executive Order 5–95 which creates a process that allows for the approval of Project Labor Agreements on certain public works projects. [Exhibit P–15; N.T. 4/28/97, pp. 26, 51]

122. Executive Order 5–95 and the Project Labor Agreements created pursuant thereto do not preclude the use of "open-shop" contractors. [Exhibits P–15 and P–16; N.T. 5/22/96, p. 158; N.T. 4/28/907, p. 27]

123. Project Labor Agreements are advantageous to the City in terms of cost, productivity, and time. [N.T. 5/22/96, p. 157]

124. Bid No. 6551 was not subject to a Project Labor Agreement. [N.T. 4/28/97, p. 27]

125. The City had no official or unofficial pro union policy with respect to the procure-

ment and the award of public contracts, and has no policy of trying to disqualify non-union bidders simply because they are non-union. [N.T. 5/23/96, p. 220; N.T. 4/17/97, p. 66]

126. There was no agreement between Mayor Rendell and Local 98 with respect to the award of competitively bid contracts. [N.T. 4/28/97, p. 43]

127. For the years 1991 through 1995, the City has awarded 17 contracts out of a total of 150 contracts to non-union contractors for various construction work at the Philadelphia International Airport. Of these 17 contracts, 16 were for electrical construction work, with a value of $12,962,097. [Exhibit P-17; N.T. 4/18/97, p. 211]

128. In 1995, three contracts out of a total of 28 contracts were awarded by the City to non-union contractors for construction work at the Airport. [Exhibit P-17; N.T. 4/18/97, pp. 211-13]

129. Contractors that bid for construction work at the Airport are primarily union contractors. [N.T. 4/18/97, pp. 211-12]

130. The letter agreement with respect to the IBEW convention that was held at the Pennsylvania Convention Center from September 14, 1996, through September 20, 1996, was entered into by the Philadelphia Convention and Visitors Bureau, representing the Pennsylvania Convention Center, and the IBEW in 1992. [N.T. 4/21/97, pp. 56-57; Exhibit D-L98-1]

131. The 1996 IBEW Convention was not a quid pro quo for any action by the City on behalf of Local 98 with respect to Angelini. [N.T. 4/28/97, p. 52]

132. Whether Local 98 would have been embarrassed during the 1996 IBEW Convention on account of a non-union contractor performing work at the Airport was not something that Mayor Rendell or the City were concerned about and was not something that would have influenced the City's actions. [N.T. 4/28/97, pp. 52-53]

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 1983.

2. Angelini has failed to establish that Defendants Rendell and Cohen had any involvement in the actions complained of in their complaint.

3. At the time the City's Procurement Department disqualified Angelini, Angelini had been cited three times by the State of New Jersey's Department of Labor for prevailing wage violations.

4. The City's Procurement Department had a sound and rational basis for its initial disqualification of Angelini on Bid No. 65 § 1.

5. Angelini has failed to prove that the City's Procurement Department had a pro-union or anti-open-shop contractor policy when it initially disqualified Angelini on Bid No. 6551.

6. Angelini has failed to prove that the City Procurement Department's decision to disqualify Angelini on Bid No.6551 was the result of improper political influence or agreement between the City and Local 98.

7. Angelini was afforded a full hearing on the appeal from its disqualification on Bid No. 6551.

8. The City hearing panel had a sound and rational basis for its decision to uphold the initial disqualification of Angelini on Bid No. 6551.

9. Plaintiff has failed to prove that the initial decision to disqualify Angelini on Bid No. 6551 and the later decision of the hearing panel to uphold the disqualification was the result of improper influence or suggestion by Mayor Rendell or Chief of Staff Cohen.

10. Plaintiff has failed to prove that the disqualification of Angelini on Bid No. 6551 was disclosed to any third party by the City.

11. The City's Procurement Department had a sound and rational basis for its initial disqualification of Angelini on Bid Nos. 6582 and 6583. After Angelini was notified that it could submit bids on Bid Nos. 6582 and 6583, Angelini had sufficient time within which to submit bids to the City on Bid Nos. 6582 and 6583.

12. Angelini is not entitled to recover its alleged lost profits on the contract that was awarded on Bid No. 6551, or for any alleged

damage to its bonding capacity which allegedly flowed from the "loss" of the contract that was awarded on Bid No. 6551.

13. Angelini has not proven that it was damaged in its "standing and association in the community" or that it has been so stigmatized by the City disqualification that its ability to pursue a livelihood as a public works contractor or to pursue governmental contracting opportunities has been foreclosed or diminished.

14. Angelini's business operations have not been affected in any way by the City's disqualifications of Angelini on Bid No. 6551.

15. Plaintiff has failed to prove that the City's actions and the actions of the individual City Defendants were the result of bad faith, bias or improper influence.

16. Angelini has failed to prove a violation of its liberty interests as set forth in *Robb v. City of Philadelphia*, 733 F.2d 286, 294 (1984).

17. The evidence in this matter indicates that Local 98 submitted information to various City officials about Angelini. The City conducted its own investigation into Local 98's allegations and rejected all but the alleged violations of the prevailing wage laws. Local 98 did not act with any State appeals to deprive Angelini of a consitutionally protected right.

## DISCUSSION

### PROCEDURAL DUE PROCESS

Even if the Plaintiff had a protected property interest or liberty interest, it has failed to meet its burden of proof, which is to show, that it was deprived of that interest without due process of law.

█ Procedural due process requires that a constitutionally protected interest will not be taken away without an opportunity for the person being deprived of that interest to be heard. Procedural due process requires notice of the intended deprivation and an opportunity to be heard prior to the deprivation, and a hearing after the deprivation. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). These requirements

have been clearly satisfied in this instance. Angelini received written notification of its disqualification on Bid 6551, and written notice of the City's refusal to accept its bid on Bids 6582 and 6583. It was afforded hearings on both of those matters. At these hearings, Angelini was given the right to have counsel present and the opportunity to present evidence and cross-examine witnesses. As to Bids 6582 and 6583, this procedure resulted in overturning Angelini's disqualification. Angelini's suggestion that the February 13, 1996, Procurement Panel hearing, was nothing more than a "sham" is not supported by the evidence nor by the facts as found by this Court.

Under Pennsylvania's Local Agency Law, 2 Pa.C.S. § 101, *et seq.*, Angelini had the right to appeal the Procurement Panel's decision which altered Angelini's previous status as a "responsible bidder", to the Court of Common Pleas. I find that Angelini was afforded due process to protect any personal rights or liberty interest that may have been affected by the hearing panel's decision. *See McDaniels*, 59 F.3d at 461; *DeBlasio v. Zoning Bd. of Adjustment for Tp. of West Amwell*, 53 F.3d 592, 597 (3d Cir.1995).

### SUBSTANTIVE DUE PROCESS— PROPERTY INTEREST

Angelini's complaint alleges a denial of substantive due process, basing its claim on an alleged deprivation of both property and liberty interest.

█ "Property interests are not generally created by the Constitution. Instead, property interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Unger v. National Residents Matching Program*, 928 F.2d 1392, 1396 (3rd Cir.1991).

█ Although a property interest is created and defined by state law, "federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Berlanti v. Bodman*, 780 F.2d 296, 299 (3d Cir.1985) (quoting *Memphis Light*,

*Gas & Water Division v. Craft*, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978)).

■ Under Pennsylvania Law, a disappointed bidder has no cause of action for failure to receive a contract because a disappointed bidder has sustained no personal injury which entitles it to redress in court. *R.S. Noonan, Inc. v. School Dist. of The City of York*, 400 Pa. 391, 394–5, 162 A.2d 623, 625 (1960). Under Pennsylvania Law only a taxpayer has standing to enforce compliance with the requirements that public contracts be awarded to the "lowest responsible bidder". *Lutz Appellate Printers v. Com., Dept. of Property & Supplies*, 472 Pa. 28, 370 A.2d 1210, 1212 (1977).

It is clear therefore that Angelini cannot demonstrate a property interest in the contract awarded to Lombardo & Lite.

### SUBSTANTIVE DUE PROCESS— LIBERTY INTEREST

In addition to alleging deprivation of its "property interest", Angelini claims that the Defendants' actions deprived it of a "liberty" interest in its status as a "responsible contractor" and its "freedom to take advantage of other contractual opportunities" and that this was a violation of its right to "substantive due process." *See* Complaint, at ¶¶ 131–132.

Specifically, Angelini claims that it will be required to "disclose whether (it) has ever been discharged or declared non-responsible by a public entity or agency." *See* Complaint, at ¶ 128. Angelini also alleges that the disqualification on Bid No. 6551 served to "stigmatize" Angelini and "severely and adversely impacted (its) ability to conduct business." *See* Complaint, at ¶ 130. Angelini further alleges that the acts of the City Defendants "destroyed an extremely beneficial classification previously enjoyed by Angelini, to wit, its classification as a responsible contractor, and said individuals' acts and/or omissions have foreclosed Angelini's freedom to take advantage of other contractual opportunities." *See* Complaint, at ¶ 131.

■ Liberty "denotes not merely freedom from bodily restraint" but also, the right of the individual to contract to engage in any of the common occupations of the law ... *Unger*, 928 F.2d at 1395–96 (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042.)

■ The Third Circuit has stated that an employment action implicates a Fourteenth Amendment liberty interest "only if it (1) is based on a 'charge against the [individual] that might seriously damage his standing and association in the community ... for example, [by implying that he had been guilty of dishonesty, or immorality,' or (2) 'impose[s] on him a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities.' "] *Robb v. City of Philadelphia*, 733 F.2d 286, 294 (1984). The following facts, which I have found, clearly illustrate that there has been no deprivation of any liberty interest of Angelini and that the Defendants are entitled to a verdict in their favor:

81. The disqualification of Angelini on Bid No.6551 was effective for that bid only. It did not prevent Angelini from seeking to be pre-qualified for future City bids. [N.T. 4/21/97, at p. 15]

82. Angelini was never placed on the City's "Problem Contractors' List." [N.T. 4/21/97, p. 17]

110. After its disqualification by the City on Bid No. 6551, Angelini submitted bids for public works contracts in New Jersey, Pennsylvania and Delaware. [Final Joint Pretrial Order]

111. Angelini has submitted nine bids for general construction work in New Jersey and Delaware, 46 bids for electrical construction work in New Jersey, Pennsylvania and Delaware, and 19 bids for miscellaneous construction work in New Jersey, Pennsylvania and Delaware. [Final Joint Pretrial Order]

112. In connection with its public bidding since its disqualification by the City, Angelini has not disclosed to any public or government agency or official its disqualification by the City on Bid No. 6551. [Final Joint Pretrial Order]

113. After February 13, 1996, with the exception of City of Philadelphia Bid Nos. 6582 and 6583 (where its disqualification was

subsequently reversed by the City), Angelini has not been disqualified from submitting a bid on any public or government contract as a consequence of the City's disqualification of Angelini on Bid No. 6551. [Final Joint Pretrial Order]

114. Angelini has also not been disqualified from receiving an award of a public or government contract as a consequence of the City's disqualification of Angelini on Bid No. 6551. [Final Joint Pretrial Order]

115. After February 13, 1996, Angelini has been awarded two public contracts for general construction work with a total value of $10,816,625 and seven public contracts for electrical construction work with a total value of $10,440,508. [Final Joint Pretrial Order]

116. After February 13, 1996, Angelini has been awarded two additional public contracts for electrical construction work—the PATCO project and the Radnor H.S. project—with a total value of $9,537,667. [Exhibit D–9; N.T. 4/18/97, pp. 123–24]

117. The total value of public contracts awarded to Angelini after February 13, 1996, is $31,078,800. [Exhibit D–9]

118. Angelini's expert witness, Gordon Curtis, did not perform any analysis of Angelini's business operations in order to determine the capacity of Angelini to perform any specific volume of contracting work, such as, *e.g.*, $50 million of work, and Mr. Curtis therefore could not state the capability of Angelini to undertake the allegedly lost work opportunities claimed by Angelini. [N.T. 4/18/97, p. 41]

119. Mr. Curtis could not name a single project which Angelini did not receive that it would have performed had its bonding capacity been increased. [N.T. 4/18/97, p. 42]

120. Since February 13, 1996, Angelini has never formally requested that its bonding capacity or limit be increased. [N.T. 4/17/97, p. 134]

For all of the foregoing reasons, I enter the following:

***ORDER***

AND NOW, this 24th day of November 1997, it is hereby ORDERED, JUDGED and DECREED:

1. Judgment is hereby entered in favor of all Defendants and against Plaintiff, Ray Angelini, Inc.

2. Costs are placed upon the Plaintiff, Ray Angelini, Inc.

3. Defendant International Brotherhood of Electrical Workers, Local Union No. 98's request for counsel fees is DENIED.

4. The Complaint is Dismissed with prejudice.