**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

INTERPIPE CONTRACTING, INC.;
ASSOCIATED BUILDERS AND
CONTRACTORS OF CALIFORNIA
COOPERATION COMMITTEE, INC.,
        *Plaintiffs-Appellants*,

        v.

XAVIER BECERRA, in his official
capacity as Attorney General of the
State of California; CHRISTINE
BAKER, in her official capacity as
Director of the California
Department of Industrial Relations;
JULIE A. SU, in her official capacity
as California Labor Commissioner,
Division of Labor Standards
Enforcement,
        *Defendants-Appellees.*

No. 17-55248

D.C. No.
3:16-cv-02247-
BEN-NLS

INTERPIPE CONTRACTING, INC.,
*Plaintiff-Appellant*,

and

ASSOCIATED BUILDERS AND
CONTRACTORS OF CALIFORNIA
COOPERATION COMMITTEE, INC.,
*Plaintiff*,

v.

XAVIER BECERRA, in his official
capacity as Attorney General of the
State of California; CHRISTINE
BAKER, in her official capacity as
Director of the California
Department of Industrial Relations;
JULIE A. SU, in her official capacity
as California Labor Commissioner,
Division of Labor Standards
Enforcement,
*Defendants-Appellees.*

No. 17-55263

D.C. No.
3:16-cv-02247-
BEN-NLS

OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, Senior District Judge, Presiding

Argued and Submitted February 5, 2018
Pasadena, California

Filed July 30, 2018

Before:  Consuelo M. Callahan and Jacqueline H. Nguyen,
Circuit Judges, and Robert W. Pratt,[*] District Judge.

Opinion by Judge Callahan

---

[*] The Honorable Robert W. Pratt, United States District Judge for the
Southern District of Iowa, sitting by designation.

# SUMMARY[**]

## Civil Rights

The panel affirmed the district court's dismissal of an action challenging a 2017 amendment to the California labor code that imposed a wage-credit limitation on employers for payments to third-party industry advancement funds (Senate Bill 954).

Pursuant to the California's labor code, employers must pay public works employees either the prevailing wage or pay a combination of cash wages and benefits.  The list of eligible benefits includes employer payments to third-party industry advancement funds.  Amendment SB 954 permits employers to take a wage-credit for advancement fund contributions only if their employees consent to doing so through a collective bargaining agreement negotiated by a union. Plaintiff is a contractor that favors open shop employment arrangements and opposes project labor agreements on public works projects.   Prior to the amendment, plaintiff took a wage credit for its contributions to co-plaintiff ABC-CCC, an industry advancement fund that opposes project labor agreements and supports open shop arrangements.  Since SB 954 went into effect, plaintiff has ceased making payments to ABC-CCC.

The panel held that amendment SB 954 does not frustrate the objectives of the National Labor Relations Act and is not preempted under the doctrine set forth in *Machinists v. Wis.*

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

*Emp't Relations Comm'n*, 427 U.S. 132 (1976). The panel held that by setting a floor for employee pay while allowing unionized employees to opt out of a particular provision, California has acted well within the ambit of its traditional police powers. SB 954 also does not violate ABC-CCC's alleged First Amendment rights. Contrary to its assertion, ABC-CCC has no free-floating First Amendment right to "amass" funds to finance its speech. And to the extent SB 954 implicates ABC-CCC's speech interests at all, those interests are not constitutional in nature because SB 954 merely trims a state subsidy of speech, and does so in a viewpoint-neutral way. The panel concluded that the law was therefore subject to rational basis review. Under that lenient standard, because SB 954 was rationally related to a legitimate government purpose—ensuring meaningful employee consent before employers contribute portions of their wages to third-party advocacy groups—it easily withstood scrutiny. The panel further concluded that ABC-CCC lacked standing to press its equal protection claim because the law applied to employers, and so ABC-CCC could not show that SB 954 causes an equal protection injury *to itself*.

**COUNSEL**

David Wolds (argued), San Diego, California, for Plaintiff-Appellant Interpipe Contracting, Inc.

Anastasia P. Boden (argued), Sacramento, California, for Plaintiff-Appellant Associated Builders and Contractors of California Cooperation Committee, Inc.

Seth Goldstein (argued), Sacramento, California, for Defendant-Appellee Xavier Becerra

Ken Lau (argued), Oakland, California, for Defendants-Appellees Christine Baker and Julie A. Su.

Elizabeth D. Parry, Littler Mendelson P.C., Walnut Creek, California; Maurice Baskin, Littler Mendelson P.C., Washington, D.C.; for Amicus Curiae Associated Builders and Contractors.

Scott A. Kronland and Rebecca C. Lee, Altshuler Berzon LLP, San Francisco, California, for Amicus Curiae State Building and Construction Trades Council of California.

## OPINION

CALLAHAN, Circuit Judge:

California's labor code requires employers on public works projects to pay their employees a "prevailing wage." To comply with this requirement, employers must either pay the prevailing wage itself or pay a combination of cash wages and benefits, such as contributions to healthcare, pension funds, vacation, travel, and other fringe benefits. In 2004, the California legislature expanded the list of eligible "benefits" to include employer payments to third-party industry advancement funds ("IAFs"). But there's a catch. Since 2017, employers may take a wage-credit for IAF contributions only if their employees consent to doing so through a collective bargaining agreement ("CBA") negotiated by a union.

Plaintiffs-Appellants Interpipe Contracting, Inc. ("Interpipe") and Associated Builders and Contractors of California Cooperation Committee, Inc. ("ABC-CCC") challenge an amendment to the labor code that imposed the

2017 wage-credit limitation on these types of contributions. They argue that the amendment, SB 954, 2016 Leg., 2015–2016 Reg. Sess. (Cal. 2016), violates their constitutional rights because, they contend, it discriminates against pro-open shop advocacy.

Appellants' challenges require us to answer two questions. First, we must decide whether SB 954 is preempted by the National Labor Relations Act ("NLRA") because it regulates an aspect of labor relations that Congress intended to leave to market forces, or because it regulates non-coercive labor speech. Second, if SB 954 is not preempted, we must decide whether it violates the First Amendment and the Fourteenth Amendment's Equal Protection Clause by limiting the ability of certain IAFs to raise funds to finance their speech. Because we conclude that ABC-CCC lacks standing to press its equal protection claim, and because we hold that SB 954 is neither preempted by the NLRA nor infringes ABC-CCC's First Amendment rights, we affirm the district court's judgment dismissing Appellants' action.

## I.

### A.

Since 1931, California has required contractors on public works projects to pay their employees a "prevailing wage." Cal. Lab. Code § 1770; *State Bldg. & Constr. Trades Council of Cal., AFL-CIO v. City of Vista*, 54 Cal. 4th 547, 554 (2012). "[P]revailing wage laws are based on the . . . premise that government contractors should not be allowed to circumvent locally prevailing labor market conditions by importing cheap labor from other areas." *State Bldg. & Const. Trades Council*, 54 Cal. 4th at 555 (internal quotation marks omitted). "In satisfying the prevailing wage,

employers can either pay all cash wages or pay a combination of cash wages and benefits, like contributions to pension funds, healthcare, vacation, travel, and other fringe benefits." *Gomez v. Rossi Concrete*, *Inc*., 270 F.R.D. 579, 584 (S.D. Cal. 2010); *see also* Cal. Lab. Code § 1773.1. These "[e]mployer payments are a credit against the obligation to pay the general prevailing . . . wages." Cal. Lab. Code § 1773.1(c).

Section 1773.1 allows certain employer contributions to count toward the prevailing wage. Beginning in 2004, that provision provided that

> Per diem wages . . . shall be deemed to include employer payments for the following:
>
> (1) Health and welfare.
>
> (2) Pension.
>
> (3) Vacation.
>
> (4) Travel.
>
> (5) Subsistence.
>
> (6) Apprenticeship or other training programs . . . so long as the cost of training is reasonably related to the amount of the contributions.
>
> (7) Worker protection and assistance programs or committees . . . to the extent that the activities of the programs or committees

are directed to the monitoring and enforcement of laws related to public works.

(8) Industry advancement and [CBA] administrative fees, provided that these payments are required under a [CBA] pertaining to the particular craft, classification, or type of work within the locality or the nearest labor market area at issue.

(9) Other purposes similar to those specified in paragraphs (1) to (8), inclusive.

*Id.* § 1773.1(a) (2004). Prior to 2004, employers could credit contributions only to numbers (1) through (6) above. *Id.* § 1773.1(a) (2003). The 2004 version expanded the credit to include contributions to IAFs—number (8)—subject to approval under a CBA.

The added IAF wage-credit option sparked controversy when employers began interpreting subsection (9) as allowing them to wage-credit contributions to IAFs *without employee consent*, so long as the recipient IAFs were similar to, but not covered by, a CBA, as set forth in subsection (8). To close this loophole, in 2016 the state legislature amended § 1773.1 with SB 954—the law at issue here. SB 954 clarifies that subsection (9) allows wage crediting only for "other purposes similar to those specified in paragraphs (6) to (8), inclusive, *if the payments are made pursuant to a [CBA] to which the employer is obligated.*" *Id.* § 1773.1(a)(9) (2017) (emphasis added). Thus, since SB 954 went into effect on January 1, 2017, it has been clear that employers may reduce payments to employees to support

their contributions to IAFs only if doing so is approved by their employees through a CBA.

Interpipe is a plumbing and pipeline contractor that favors "open shop" employment arrangements and opposes project labor agreements ("PLAs") on public works projects. "Open shop" is labor vernacular for projects involving an employer that has no formal contracts with a labor union, and where both unionized and non-unionized labor is permitted. *Del Turco v. Speedwell Design*, 623 F. Supp. 2d 319, 326 (E.D.N.Y. 2009); *Ray Angelini, Inc. v. City of Philadelphia*, 984 F. Supp. 873, 875 (E.D. Pa. 1997). A PLA, by contrast, is a type of collective bargaining relationship involving multiple employers and unions that agree to abide by a uniform labor agreement in their bids on public works projects. *Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 30 (D.C. Cir. 2002).

Before SB 954 took effect, Interpipe took a wage credit for its contributions to ABC-CCC—an IAF that opposes PLAs and supports open shop arrangements. Since SB 954 went into effect, Interpipe has ceased making payments to ABC-CCC.

## B.

Interpipe and ABC-CCC brought this action against California state officials ("Appellees" or "the State")[1] in federal district court challenging SB 954 on constitutional grounds. Appellants claimed that SB 954 violates the Supremacy Clause by frustrating the purposes of the NLRA,

---

[1] Appellants named as Defendants Xavier Becerra, the Attorney General of California, Christine Baker, the Director of the California Department of Industrial Relations, Julie A. Su, the California Labor Commissioner, and other state officials.

29 U.S.C. § 151 *et seq*.  They argued that the law regulates in an area Congress intended to leave to the free play of market forces, and is preempted by the NLRA's prohibition on regulating non-coercive labor speech.  ABC-CCC alone brought two additional claims: that SB 954 infringes its First Amendment right to free speech and violates the Equal Protection Clause.  Appellants filed a motion for preliminary injunction and Appellees filed motions to dismiss and a motion for judgment on the pleadings.

On January 27, 2017, the district court denied Appellants' motion for a preliminary injunction and dismissed their action.  *Associated Builders & Contractors of Cal. Cooperation Comm., Inc. v. Becerra*, 231 F. Supp. 3d 810, 828 (S.D. Cal. 2017).  The court held that the NLRA does not preempt SB 954, that SB 954 does not infringe ABC-CCC's First Amendment rights, and that ABC-CCC lacked standing to bring its equal protection claim.  *Id.* at 820–28.  As to the NLRA claim, the court held that *Machinists*[2] preemption—a doctrine deeming preempted conduct that "'Congress intended be unregulated,'" *id.* at 820 (quoting *Chamber of Commerce of U.S. v. Brown*, 554 U.S. 60, 65 (2008)), such as collective bargaining—did not apply because the NLRA preserves States' authority to set minimum labor standards, and SB 954 is such a standard.  *Id*. at 821–24.  The court further held that SB 954 does not regulate non-coercive labor speech because it "does not prevent employers or employees from speaking about any issue."  *Id*. at 823.  Finally, the court held that *Garmon*[3] preemption—a doctrine deeming preempted state laws regulating matters governed by the NLRA—did not apply

[2] Machinists v. Wis. Emp't Relations Comm'n, 427 U.S. 132 (1976).

[3] San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236 (1959).

because SB 954 "places no substantive restrictions on the terms of [CBAs] and does not regulate or preclude speech about unionization or labor issues." *Id*. at 825.

As to ABC-CCC's First Amendment claim, the district court found that SB 954 operates as a state subsidy of speech and does not restrict anyone's right to speak. *Id*. at 825–27. Because "nothing requires government 'to assist others in funding the expression of particular ideas, including political ones,'" *id.* at 825 (quoting *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009)), the court held that "'[the] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny,'" *id.* (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983)). The court also rejected ABC-CCC's claim that SB 954 is viewpoint discriminatory. The court found that "the statute is neutral and does not favor, target, or suppress any particular speaker or viewpoint." *Id*. at 826. Accordingly, it applied rational basis review and held SB 954 to be a permissible exercise of California's police powers to regulate employee wages. *Id*. at 827.

Finally, the court held that ABC-CCC lacked standing on its equal protection claim because SB 954 "does not discriminate against ABC-CCC—if it does discriminate, it discriminates against employers not subject to CBAs, like Interpipe." *Id*. at 819.

Interpipe and ABC-CCC filed timely, separate appeals, which were consolidated.

**II.**

Appellants bring a facial challenge to SB 954 as they seek a declaration that SB 954 is unconstitutional in all

circumstances.  Our review therefore focuses on whether SB 954 is *per se* unlawful.  *See Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 579 (1987).

We "review de novo a district court's order granting a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)," *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017), and apply the same standard of review to a district court's order granting a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).  We "will affirm a dismissal for failure to state a claim where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory."  *L.A. Lakers*, 869 F.3d at 800 (internal quotation marks omitted).  We must "accept the factual allegations of the complaint as true and construe them in the light most favorable to the plaintiff."  *Id.* (internal quotation marks omitted).  Where the district court has considered documents attached to the complaint, we review facts in those documents together with the complaint itself.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003); *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987).  We also review the district court's denial of Appellants' motion for a preliminary injunction de novo because the court's conclusion was based solely on conclusions of law.  *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1121 (9th Cir. 2005).

## III.

## A.

The NLRA codifies employees' right to bargain collectively, seeks to equalize bargaining power between employers and employees, and preempts state laws that

frustrate the accomplishment of these goals. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 20–21 (1987); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 747–48, 753–54 (1985); *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 835 (1984). "The NLRA's declared purpose is to remedy '[t]he inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association.'" *Metro. Life Ins.*, 471 U.S. at 753 (quoting NLRA § 1, 29 U.S.C. § 151); *see also Livadas v. Bradshaw*, 512 U.S. 107, 117 & n.11 (1994) (explaining that the NLRA is a "statutory scheme premised on the centrality of the right to bargain collectively" and preempts "a State's penalty on those who complete the collective-bargaining process"). Thus, the statute stresses the "desirability of 'restoring equality of bargaining power,' among other ways, 'by encouraging the practice and procedure of collective bargaining . . . .'" *Metro. Life Ins.*, 471 U.S. at 753–54 (quoting NLRA § 1, 29 U.S.C. § 151).

While the NLRA contains no express preemption provision, two categories of state action are implicitly preempted: (1) laws that regulate conduct that is either protected or prohibited by the NLRA (*Garmon* preemption), and (2) laws that regulate in an area Congress intended to leave unregulated or "'controlled by the free play of economic forces'" (*Machinists* preemption). *Brown*, 554 U.S. at 65 (quoting *Machinists v. Wis. Emp't Relations Comm'n*, 427 U.S. 132, 140 (1976)) (internal quotation

marks omitted).  Interpipe argues that SB 954 is preempted under a *Machinists* theory.[4]

*Machinists* preemption "protects against state interference with policies implicated by the structure of the [NLRA] itself, by pre-empting state law and state causes of action concerning conduct that Congress intended to be unregulated." *Metro. Life Ins.*, 471 U.S. at 749.  The doctrine bars states from interfering with the collective bargaining process and from regulating non-coercive labor speech by an employer, employee, or an employee's union. *See id.* at 751; *Brown*, 554 U.S. at 67–68.  Interpipe argues that SB 954 constitutes state interference with its labor speech supporting pro-open shop advocacy by IAFs like ABC-CCC.

**B.**

Virtually any labor standard—e.g., wage and hour requirements—will affect the terms of a CBA, but the pertinent question under *Machinists* is whether such a standard interferes with the collective bargaining *process*. *Metro. Life Ins.*, 471 U.S. at 756.  The Supreme Court has explained that

> there is no suggestion in the legislative history of the [NLRA] that Congress intended to disturb the myriad state laws then in existence that set minimum labor standards, but were unrelated in any way to the processes of bargaining or self-

---

[4] Interpipe abandoned its *Garmon* preemption claim by stating in its opening brief that it would focus "exclusively on how *Machinists* preempts SB 954."

organization. To the contrary, we believe that Congress developed the framework for self-organization and collective bargaining of the NLRA within the larger body of state law promoting public health and safety . . . . "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State. Child labor laws, minimum and other wage laws, laws affecting occupational health and safety . . . are only a few examples."

*Id.* (quoting *DeCanas v. Bica*, 424 U.S. 351, 356 (1976)). Minimum labor standards will necessarily affect employer-employee relations by "form[ing] a backdrop"—i.e., setting the statutory baseline—for collective bargaining negotiations. *Fort Halifax*, 482 U.S. at 21 (internal quotation marks omitted). But such *effects* differ in kind from a State's regulation of the bargaining process itself. "[S]tate action that intrudes on the mechanics of collective bargaining is preempted, but state action that sets the stage for such bargaining is not." *Am. Hotel & Lodging Ass'n v. City of L.A.*, 834 F.3d 958, 964 (9th Cir. 2016).

This accommodation of state labor law is of a piece with the NLRA's structure and generally applicable preemption principles. It reflects that "[t]he NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment, and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions." *Metro. Life Ins.*, 471 U.S. at 753; *Fort Halifax*, 482 U.S. at 20. It is also consistent with the presumption against preemption that applies in areas of traditional state

regulation, *Wyeth v. Levine*, 555 U.S. 555, 565 (2009), as "the establishment of labor standards falls within the traditional police power of the State," *Fort Halifax*, 482 U.S. at 21. Thus, "preemption should not be lightly inferred in this area." *Id.*

Interpipe and the State agree that SB 954 is a minimum labor standard. But Interpipe argues that SB 954 is still preempted under *Machinists* because, it reasons, the law favors pro-union, pro-PLA speech over anti-union, pro-open shop speech. Interpipe asserts that "SB 954 is a minimum labor standards law that is inconsistent with the general NLRA policy protecting labor speech and favoring open and robust debate on matters dividing unions and employers (including debate regarding 'top down' organizing through PLAs)." Interpipe reasons that unionized employees might consent to wage-crediting that benefits pro-union IAFs, but would definitely not approve of wage-crediting that benefits pro-open shop IAFs. Such discriminatory effects, Interpipe argues, run afoul of the NLRA's protection of labor speech.

Interpipe's argument fails because SB 954 is a legitimate minimum labor standard that regulates no one's labor speech. First, in arguing otherwise, Interpipe sails full steam ahead into a flotilla of cases upholding generally applicable labor laws that include opt-out provisions limited to CBAs.[5]

---

[5] Amicus Associated Builders and Contractors, Inc.'s ("ABC") motion to file an amicus brief is **GRANTED**. ABC asserts that California is the only State to "impose[] . . . [a] discriminatory restrictive limitation on non-union employer contributions to funds." We find this statement somewhat misleading based on a review of ABC's citation to nine other States' prevailing wage laws. In fact, those States do not allow *any* wage-crediting for contributions made to the particular types of "funds" at issue here—IAFs. Instead, those States allow wage crediting only for

Consistent with the NLRA's goal of promoting collective bargaining, courts have long upheld state laws that permit *only* unions to opt out of state labor standards. *See, e.g.*, *Fort Halifax*, 482 U.S. at 22 (upholding state law requiring severance payments to laid-off employees but allowing unionized workers to opt out through a CBA); *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 489–90 (9th Cir. 1996) (upholding California law setting a maximum workday standard for mineworkers but allowing unionized workers to opt out through a CBA); *Am. Hotel & Lodging*, 834 F.3d at 965 (upholding county ordinance setting a minimum wage and time-off compensation but allowing unionized workers to opt out through a CBA); *Nat'l Broad. Co. v. Bradshaw*, 70 F.3d 69, 73 (9th Cir. 1995) (upholding state law setting minimum overtime pay requirements but allowing unionized workers to opt out through a CBA). Opt-out provisions limited to unions are consistent with Congress' objectives under the NLRA because the risk of coercion is low where bargaining power between employers and employees is in equipoise. *See Metro. Life Ins.*, 471 U.S. at 753; *Fort Halifax*, 482 U.S. at 20.

Second, Interpipe conflates labor standards affecting employers' ability to *fund* their speech with unlawful regulations *of* their speech. The NLRA provides that

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such

---

programs that *inure directly to the benefit of employees*, such as pension plans and health benefit programs.

> expression contains no threat of reprisal or
> force or promise of benefit.

NLRA § 8(c), 29 U.S.C. § 158(c).   In enacting § 8(c), Congress sought to encourage "free debate" on labor issues. *Brown*, 554 U.S. at 67.   To that end, the NLRA prohibits government policies that frustrate "'uninhibited, robust, and wide-open debate in labor disputes'" and also "precludes regulation of [non-coercive] speech about unionization."**[6]** *Id.* at 68 (quoting *Letter Carriers v. Austin*, 418 U.S. 264, 272–73 (1974)).   Interpipe implicitly concedes that SB 954 does not regulate its own speech, but contends that neither did the law in *Brown*, which the Supreme Court invalidated.

Interpipe's reliance on *Brown* is misplaced.   *Brown* stands for the straightforward proposition that § 8(c) means what it says: the government may not "regulate[]" non-coercive labor speech.   *Id*.   *Brown* involved a California law (AB 1889) that prohibited certain employers from using state financial subsidies "'to assist, promote, or deter union organizing.'"   *Id.* at 63 (quoting Cal. Gov't Code §§ 16645.1–16645.7).   The Court did not dispute California's right to determine how such state "subsidies" could be used, *see id.* at 73–74, nor did it rely on AB 1889's disparate treatment of certain pro-union activities, which were exempt from the law's restriction,**[7]** *see id.* at 70–71.

---

**[6]** Section 8(c) does not protect "coercive" labor speech—i.e., speech that "contain[s] a threat of reprisal or force or promise of benefit.'" *Brown*, 554 U.S. at 68 (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969)).

**[7]** To the contrary, the Court made plain that "a State may 'choos[e] to fund a program dedicated to advance certain permissible goals'" over others.   *Brown*, 554 U.S. at 73 (alteration in original) (quoting *Rust v. Sullivan*, 500 U.S. 173, 194 (1991)).

Instead, the Court deemed AB 1889 preempted because its complex and severe enforcement scheme chilled employers' use *of their own money* to engage in protected labor speech. *See id.* at 71–73. The law required employers to maintain records ensuring segregation of state and private funds, which was "no small feat" because the law drilled into virtually every aspect of an employer's operations. *Id.* at 72. Moreover, AB 1889's "[p]rohibited expenditures include[d] not only discrete expenses such as legal and consulting fees, but also an allocation of overhead, including salaries of supervisors and employees, for any time and resources spent on union-related advocacy." *Id.* (internal quotation marks omitted). Finally, the law imposed "deterrent litigation risks." *Id.* Any person could bring a civil action seeking injunctive relief, damages, civil penalties, and other relief for a suspected violation. *Id.* And liable employers could be slapped with fines trebling the amount of state funds the employer spent on "'assist[ing], promot[ing], or deter[ring] union organizing.'" *Id.* at 63, 72 (quoting Cal. Gov't Code Ann. §§ 16645.1–16645.7).

The Court found that AB 1889's draconian enforcement provisions effectively put employers to a coercive choice: "either . . . forgo [their] 'free speech right to communicate [their labor] views to [their] employees,' or else . . . refuse the receipt of any state funds." *Id.* at 73 (internal citation omitted) (quoting *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 617 (1969)). In other words, AB 1889 effectively forced employers to either relinquish their right to engage in NLRA-protected speech *with their own money* in order to avoid costly litigation and recordkeeping requirements, or refuse the state subsidy, avoid the law's enforcement scheme altogether, and be free to exercise their NLRA speech rights. The Court held that "[i]n so doing, the statute impermissibly 'predicat[es] benefits on refraining from conduct protected

by federal labor law,' and chills one side of the 'robust debate which has been protected under the NLRA.'" *Id.* (internal citation omitted) (quoting *Livadas*, 512 U.S. at 116 and *Letter Carriers,* 418 U.S. at 275).

SB 954 differs from AB 1889 in a crucial way. Unlike AB 1889, SB 954 does not—either directly or indirectly through coercion—limit employers' use *of their own funds* to engage in whatever labor speech they like. As the district court observed, SB 954 imposes no "compliance burdens or litigation risks that pressure Plaintiffs to forgo their speech rights in exchange for the receipt of state funds." *Associated Builders & Contractors of Cal. Cooperation Comm.*, 231 F. Supp. 3d at 823. SB 954 simply bars employers from diverting their employees' wages to the employers' preferred IAFs without their employees' collective consent.

SB 954 is also unlike AB 1889 in that it is a minimum labor standard, whereas AB 1889 was not. SB 954 therefore falls into the category of state labor laws typically saved from preemption, and so the presumption against preemption applies with particular force. *Fort Halifax*, 482 U.S. at 21. As the Supreme Court made clear, "there is no suggestion in the legislative history of the [NLRA] that Congress intended to disturb the myriad state laws then in existence that set minimum labor standards, but were unrelated in any way to the *processes* of bargaining or self-organization." *Metro. Life Ins.*, 471 U.S. at 756 (emphasis added). Thus, absent compelling evidence—lacking here—that SB 954 impairs Interpipe's ability to engage in non-coercive labor speech, we cannot invalidate a legitimate exercise of California's traditional police power to regulate labor conditions. Accordingly, we hold that SB 954 does not infringe employers' NLRA-protected right to engage in labor speech and is not preempted by the NLRA.

**IV.**

**A.**

Having determined that SB 954 is not preempted under *Machinists*, we proceed to consider whether it is invalid under the First Amendment.**[8]** ABC-CCC asserts that SB 954 "limits the way private speakers"—in this case IAFs like ABC-CCC—"may raise money to fund their speech activities," and therefore infringes its right to free speech.**[9]**

---

**[8]** The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.

**[9]** Because Article III standing is jurisdictional, we must *sua sponte* assure ourselves of ABC-CCC's standing to pursue its First Amendment claim. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). Article III standing requires a party to show that it has (1) suffered a concrete and particularized, actual or imminent injury-in-fact, (2) which is fairly traceable to the challenged conduct, and (3) which is likely to be redressed by a ruling in its favor. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). ABC-CCC clearly satisfies the first and second prongs because it alleges facts showing it has suffered an economic injury—diminution in funding—that is fairly traceable to SB 954. But the redressability analysis requires more effort because ABC-CCC is not the party being regulated—SB 954 regulates its benefactors. *See id.* at 562. "When, . . . as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation . . . of *someone else*," "causation and redressability ordinarily hinge on the *response* of the regulated (or regulable) third party to the government action or inaction." *Id.* (first emphasis in original; second emphasis added). Even if we were to enjoin enforcement of SB 954, ABC-CCC's injury might persist because contributors like Interpipe could decide not to resume their funding. Nonetheless, because Interpipe and other employers have submitted declarations testifying to their concrete intentions to resume contributions to ABC-CCC should we enjoin SB 954, ABC-CCC has

Notably, ABC-CCC does not dispute that SB 954 leaves it free to speak and express itself at will. Nor does ABC-CCC suggest that SB 954 prevents employers (and employees for that matter) from contributing to ABC-CCC. Instead, it advances a novel First Amendment theory: that it has a protected First Amendment right to *receive* the employee-subsidized funds from Interpipe and other employers. ABC-CCC claims that "[l]aws that restrict the ability to fund one's speech are burdens on speech."[10]

ABC-CCC swerves off course straight out of the gate by equating a contributor's right to fund an entity's speech with a recipient's right to receive another's financial largesse. The Supreme Court has said otherwise. In *Regan*, the Court held that "[a]lthough [an organization] does not have as much money as it wants, and thus cannot exercise its freedom of speech as much as it would like, the Constitution 'does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom.'" 461 U.S. at 550 (quoting *Harris v. McRae*, 448 U.S. 297, 318 (1980)). In other words, there exists no standalone right to receive the funds necessary to finance one's own speech. ABC-CCC's theory ignores this bedrock principle and, in so doing, misapplies Supreme Court precedent addressing the First Amendment rights of campaign contributors and charitable organizations.

---

shown it to be likely that a favorable decision would redress its injury. It therefore has standing to press its First Amendment claim.

[10] To be sure, ABC-CCC elsewhere argues that SB 954 violates the First Amendment by allegedly discriminating based on viewpoint. But ABC-CCC also makes clear its belief that a broader constitutional right is at stake: an asserted First Amendment right to be free from a legislative "burden" on its "ability to receive contributions."

**i.**

It is well-established that "'contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities.'" *McCutcheon v. FEC*, 134 S. Ct. 1434, 1444 (2014) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam)); *see also Randall v. Sorrell*, 548 U.S. 230, 247–48 (2006). As concerns political contributions in particular, this First Amendment right is reflected in the "'symbolic expression of support evidenced by a contribution.'" *McCutcheon*, 134 S. Ct. at 1444 (quoting *Buckley*, 424 U.S. at 21). The question in cases challenging contribution limitations is whether the law "infringe[s] the contributor's freedom to discuss candidates and issues.'" *Id.* at 1444 (quoting *Buckley*, 424 U.S. at 21).

ABC-CCC asserts that where monetary contributions are involved, the First Amendment right applies equally to the contributor *and* the recipient. In support, ABC-CCC looks to *Randall*, where the Court observed that a Vermont campaign finance law diminished candidates' ability to "'amass[] the resources necessary for effective advocacy.'" 548 U.S. at 248 (alteration omitted) (quoting *Buckley*, 424 U.S. at 21). But ABC-CCC wrenches the quote out of context. *Randall* is, at bottom, a case about the free speech rights of contributors; it does not establish an independent constitutional right of recipients to "amass" funds.

*Randall* involved a challenge to Vermont's campaign finance law setting contribution limits. *Id.* at 238–39. To determine whether the restriction withstood First Amendment scrutiny, the Court applied the test set forth decades earlier in *Buckley*. That test requires assessing, among other things, whether the "'contribution restriction[] could have a severe impact on political dialogue . . . [by] prevent[ing] candidates and political committees from

amassing the resources necessary for effective advocacy.'" *Id.* at 247 (quoting *Buckley*, 424 U.S. at 21). The First Amendment interest implicated, however, was the right of an individual to contribute, not the right of a political candidate or organization to amass funds. The question was whether the restriction impermissibly affected *contributors'* First Amendment rights—the determination of which turned in part on measuring the impact on recipients of such contributions. *See id.* An analogous fact pattern might involve a claim by Interpipe that SB 954 violates its First Amendment right to contribute to ABC-CCC's advocacy, an analysis of which might consider the effect of such a restriction on ABC-CCC's speech. But Interpipe brings no such claim.[11]

Our reading of *Randall* is confirmed by the Court's later decision in *Davis v. FEC*, 554 U.S. 724 (2008). There, the Court invalidated a federal campaign finance law increasing contribution limits for non-self-financing political candidates if their self-financing opponent exceeded a spending threshold in their own campaign. *Id.* at 729–30, 736. The Court found that the self-financing candidate's First Amendment rights were implicated not because their

---

[11] Even if Interpipe did bring a First Amendment claim, it would still have to show that (1) SB 954 regulates speech, not just conduct, and (2) that it pares back a state subsidy of speech in a viewpoint discriminatory way. Nor could ABC-CCC seek to advance Interpipe's purported First Amendment interests. ABC-CCC does not claim third-party standing to assert Interpipe's rights, let alone seek to vindicate those rights. *Cf. Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 955–58 (1984) (holding that a fundraiser that contracted with charities could assert the charities' First Amendment rights because it had third-party standing to do so); *Viceroy Gold*, 75 F.3d at 489 (finding no third-party standing absent a showing of a "genuine obstacle" to the affected individuals bringing their own claims). ABC-CCC argues only that SB 954 violates its own right to receive funds.

ability to receive funds was disproportionately impaired, but because the law "impose[d] an unprecedented penalty on any candidate who robustly exercises [*her*] First Amendment right [to spend personal funds]"—i.e., it effectively regulated the self-financing candidate's own speech. *Id.* at 738–40; *see also Emily's List v. Fed. Election Comm'n*, 581 F.3d 1, 4–5 (D.C. Cir. 2009) (invalidating limitation on which types of contributions non-profits could *spend* on election-related activities). SB 954, by contrast, leaves IAFs free to spend their funds on expressive activities however they wish without incurring a "penalty" for doing so.

**ii.**

ABC-CCC also searches for support in decisions addressing laws limiting solicitation of funds by charities. In *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 623–24 (1980), the Court invalidated a state law requiring "at least seventy-five percent of the proceeds of [fundraising] solicitations [to] be used directly for the charitable purpose of the organization" if the charity wished to solicit funds in a public forum. The Court found that solicitation activities were "intertwined" with the charities' First Amendment rights because "charitable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment." *Schaumburg*, 444 U.S. at 631–32; *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 789 (1988) ("Our prior cases teach that the solicitation of charitable contributions is protected speech . . . ."); *Sec'y of State of Md. v. Munson*, 467 U.S. 947, 967 & n.16 (1984) (holding that a law restricting the amount charities could spend on fundraising activities infringed their ability to

solicit funds, and amounted to "a direct restriction on protected First Amendment activity"); *cf. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985) (extending *Schaumburg* to solicitation activities that are not "in-person" but are accomplished through dissemination of literature). These cases do not support ABC-CCC's claimed First Amendment right, however, because laws limiting charitable solicitations target the speaker's rights, manifested through charities' solicitation activities. SB 954, by contrast, steers clear of regulating IAFs' solicitation of funds.

### iii.

ABC-CCC's reliance on a non-precedential district court case is similarly unavailing. *United Food and Commercial Workers Local 99 v. Brewer*, 817 F. Supp. 2d 1118, 1121–22 (D. Ariz. 2011) (not appealed), concerned an Arizona law restricting some unions' ability to collect funds from employees through employer payroll deductions. Before the law took effect, employees could elect to have their employers automatically deduct from their paychecks the amount needed to pay for health insurance and union dues. *Id.* at 1121. But under the challenged law, employees were barred from doing so unless the unions either certified to employers that they would not use any of their general funds for "political purposes," or if they specified what percentage of their funds would be so used. *Id.* If a union spent any funds on politicking after it had forsworn such activities, or if it spent more than the specified percentage, it was subject to a civil fine of $10,000. *Id.* at 1122. The court held that the law implicated the unions' First Amendment rights and invalidated it as an impermissible viewpoint-based restriction on speech because it applied only to—and thereby discriminated against—particular unions. *Id.* at 1125.

At first blush, SB 954 might appear similar to Arizona's law in *United Food*. Both laws affect the contribution decisions of third parties—employees in *United Food* and employers here—which, in turn, affect another entity's ability to amass funds. But the constitutional interest in *United Food* was in the law's regulation *of the unions*, not in the law's effect of diminishing the funds the unions received. *See id.* at 1125. Similar to the campaign finance law struck down in *Davis*, Arizona's law limited the unions' speech by tying payroll deduction contributions *to* their political speech. *Id.* Moreover, if unions expressed their political views "too much," they incurred a fine, which further evinced an objective to target union speech.[12] *Id.* SB 954, by contrast, does not regulate the recipients of funds—IAFs—let alone tie the funding IAFs receive to their own expressive activities.

\* \* \*

The cases discussed in this section share a common characteristic: they address laws regulating the aggrieved party's speech. But while the First Amendment protects the right of an individual to express herself through the medium of finance, it does not establish a free-floating right to

---

[12] The Supreme Court's recent decision in *Janus v. American Federation of State, County, & Municipal Employees*, 138 S. Ct. 2448 (2018) does not affect our assessment of *United Food*. *Janus* invalidated state agency shop laws requiring nonmembers of a union to pay a fee in support of the union's collective bargaining activities—activities performed on behalf of union members and nonmembers alike. *Id.* at 2477–78. The Court did not have occasion to address, nor did it question, unions' well-established First Amendment right "to participate in the electoral process with all available funds other than [ ] state-coerced agency fees lacking affirmative permission." *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 190 (2007).

receive the funds necessary to broadcast one's speech. *Regan*, 461 U.S. at 550. Accordingly, we reject ABC-CCC's theory of a First Amendment right to amass funds to finance its speech.

## B.

Even if ABC-CCC could show that SB 954 targets its own rights as a speaker rather than as a recipient of others' financial contributions, we would find no constitutional violation because the law's aim is employer conduct—the payment of wages—that is not inherently expressive.

Conduct-based laws may implicate speech rights where (1) the conduct itself communicates a message, *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010); *Rumsfeld v. Forum for Academic & Institutional Rights, Inc. ("FAIR II")*, 547 U.S. 47, 65–66 (2006); (2) the conduct has an expressive element, *see Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984); or where, (3) even though the conduct standing alone does not express an idea, it bears a tight nexus to a protected First Amendment activity, *see Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983). Regardless of the theory, the conduct must be "'inherently expressive'" to merit constitutional protection. *Pickup v. Brown*, 740 F.3d 1208, 1225 (9th Cir. 2014) (quoting *FAIR II*, 547 U.S. at 66).

SB 954 does not regulate conduct that communicates a message or that has an expressive element. The Court's decision in *FAIR II* is instructive. *FAIR II* involved a claim brought by law schools that federal legislation tying funding to their decision whether to allow military recruiters on campus violated their First Amendment rights. 547 U.S. at 51, 66. The schools argued that the law infringed their right

to express disagreement with military policy. *Id.* at 53. The Court rejected their argument, reasoning that the law targeted conduct—"treating military recruiters differently from other recruiters"—that was not "inherently expressive." *Id.* at 66; *cf. Clark*, 468 U.S. at 296 (assuming that sleeping overnight in public parks as part of a demonstration was an expressive protest in support of the homeless). Same here. A law regulating wages does not target conduct that communicates a message nor does such conduct contain an expressive element.

Nor does regulating wages bear a tight nexus to ABC-CCC's right to free speech. In *Minneapolis Star*, the Court assessed a Minnesota law imposing a special use tax on certain paper and ink products. 460 U.S. at 577. Purchasing ink and paper is not expressive conduct, but the law applied to ink and paper products used exclusively by news publications. *Id.* at 578. Indeed, the law defined the products taxed as those "'used or consumed in producing a publication as defined [by law].'" *Id.* at 578 n.2 (quoting Minn. Stat. § 297A.14). Because the law "singled out the press for special treatment" and impaired news publications' ability to exercise their press freedoms, the law burdened interests protected by the First Amendment. *Id.* at 582–85.

SB 954 has none of the hallmarks of the Minnesota tax. Far from taking aim at IAFs' speech, SB 954 is, instead, a generally applicable wage law that targets employer use of employee wages, does not single out pro-open shop IAFs, and only indirectly affects one possible revenue source for IAFs. Indeed, the law leaves ABC-CCC free to solicit funds from employers, employees, or anyone else. That ABC-CCC may now need to explore alternative means of raising funds to finance its speech does not somehow transform a minimum wage law into a regulation of expressive conduct.

SB 954 is therefore more akin to generally applicable economic regulations affecting rather than targeting news publications that the Court has found pass constitutional muster.[13] *Id.* at 581 ("It is beyond dispute that the States and the Federal Government can subject newspapers to generally applicable economic regulations without creating constitutional problems.").

To be sure, the Supreme Court has not drawn a bright line distinguishing conduct-based laws that permissibly burden speech from those that do not. But three considerations back a requirement that, in order to trigger First Amendment scrutiny, a conduct-based law must (1) target a particular type of entity for differential treatment, and (2) regulate the ingredients necessary to effectuate that entity's First Amendment rights. First, a law regulating conduct that merely alters incentives rather than restricts the ingredients necessary for speech does not regulate conduct that is "inherently expressive"—a necessary trait of an impermissible conduct-based regulation. *FAIR II*, 547 U.S. at 66; *Pickup*, 740 F.3d at 1225. Second, applying the First Amendment to conduct that has only an indirect effect on speech would task the courts with unwieldy line drawing exercises: how indirectly related to speech must a conduct-based restriction be to avoid First Amendment scrutiny? Third, scrapping conduct-based laws that have only an attenuated relationship to speech would have the perverse effect of invalidating legitimate exercises of state authority

---

[13] Indeed, *Minneapolis Star* observed that the Minnesota tax's burden on press freedoms did not, in and of itself, trigger First Amendment scrutiny. *Minneapolis Star*, 560 U.S. at 581, 583 (noting that economic regulation of the press through anti-trust and other laws does not implicate constitutional freedoms). The law offended the First Amendment because it "singled out the press for special treatment." *Id.* at 582–85.

to protect the general health and welfare.  A labor standard like SB 954 that ensures employee approval before their wages are rerouted to third-party advocacy groups would, under ABC-CCC's theory, be subject to scrutiny simply because it *affects* ABC-CCC's ability to finance its speech. That cannot be the law.  Accordingly, because SB 954 regulates conduct that is not "inherently expressive," we hold that it does not regulate ABC-CCC's speech.

## C.

Finally, we consider whether SB 954 limits a state subsidy on speech in a viewpoint discriminatory way.  "[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right . . . ."  *Regan*, 461 U.S. at 549.  Because speech subsidies are not coated with constitutional protection, the government is typically free to limit or remove speech subsidies at its discretion, and such limitations are generally subject to rational basis review.  *Ysursa*, 555 U.S. at 358–59.  Further, the legitimacy of a State's limitation on a speech subsidy is all the more apparent where it withdraws a policy that facilitates compulsory subsidization of others' expression.  As the Supreme Court recently made clear, "[c]ompelling a person to *subsidize* the speech of other private speakers raises [] First Amendment concerns."  *Janus v. Am. Fed'n of State, Cnty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2464 (2018) (emphasis in original).  On the other hand, where a State limits a speech subsidy in a viewpoint discriminatory way, we generally apply strict scrutiny.[14]  *Rosenberger v.*

---

[14] We do not have occasion to decide whether a condition placed on a state subsidy that remedies a limitation on others' expression would, if targeted at only certain viewpoints, be subject to strict scrutiny.  We need

*Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834–35, 837 (1995) ("Having offered to pay the third-party contractors on behalf of private speakers who convey their own messages, the University may not silence the expression of selected viewpoints.").

With this framework in mind, we assess first whether SB 954 limits a state subsidy on speech or instead burdens First Amendment rights. We then evaluate whether SB 954 is viewpoint discriminatory.

**i.**

ABC-CCC argues that SB 954 burdens its constitutional right to free speech rather than limits a state subsidy of its speech. ABC-CCC begins with the premise that state subsidies of speech are inherently financial in nature. Because SB 954 "restricts the way *private parties* obtain *private funding* for their speech, at no cost to the government," ABC-CCC reasons that the law is a direct affront to its constitutional rights and must be subject to strict scrutiny.

ABC-CCC misconceives the nature of state subsidies of speech. A speech subsidy need not be financial; it may be a non-monetary means of facilitating an entity's speech—e.g., by creating a mechanism that assists the entity in funding its own speech. *Ysursa*, 555 U.S. at 358 (2009); *see also Rosenberger*, 515 U.S. at 835 (rejecting the argument that, "from a constitutional standpoint, funding of speech differs from provision of access to facilities"). And because the State has no constitutional duty to subsidize speech in the

---

not address that question because we conclude that SB 954 does not discriminate based on viewpoint.

first place, it may restrict that assistance without triggering constitutional scrutiny.  As the Chief Justice explained in *Ysursa*,

> While in some contexts the government must accommodate expression, it is not required to assist others in funding the expression of particular ideas, including political ones. "[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." *Regan v. Taxation With Representation of Wash.,* 461 U.S. 540, 549 (1983); *cf. Smith v. Highway Employees,* 441 U.S. 463, 465 (1979) (*per curiam*) ("First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize [a labor] association and bargain with it").

555 U.S. at 358 (alterations in original).  Put simply, what the government giveth it can taketh away.

*Ysursa* involved a challenge to an Idaho law barring public employees from authorizing a payroll deduction for contributions to their union's political action committee.  *Id.* at 355.  In so doing, the law did not involve any governmental financial subsidy, but it did restrict a mechanism by which the State facilitated private funding (by employees) of private speech (by the unions)—the same factual circumstance ABC-CCC identifies in the instant matter.  The Court held that Idaho's law did not violate the First Amendment because,

> While publicly administered payroll deductions for political purposes can enhance the unions' exercise of First Amendment rights, Idaho is under no obligation to aid the unions in their political activities. And the State's decision not to do so is not an abridgment of the unions' speech; they are free to engage in such speech as they see fit. They simply are barred from enlisting the State in support of that endeavor. Idaho's decision to limit public employer payroll deductions as it has "is not subject to strict scrutiny" under the First Amendment. *Regan,* 461 U.S., at 549, 103 S. Ct. 1997.

*Id.* at 359. In a statement that is acutely on point here, the Court added that "[a] decision not to assist fundraising that may, as a practical matter, result in fewer contributions is simply not the same as directly limiting expression." *Id.* at 360 n.2. Indeed, California's decision to limit assistance for IAFs' fundraising activities under SB 954 "is simply not the same as directly limiting [IAFs'] expression." *Id.*; *see also Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 187 (2007) (approving a law that placed a condition "upon [a] union's extraordinary *state* entitlement to acquire and spend *other people's* money" (emphasis in original)); *cf. Janus*, 138 S. Ct. at 2464 ("the compelled subsidization of private speech seriously impinges on First Amendment rights").

*Ysursa* relied on the Court's decision in *Davenport* to distinguish speech subsidies from First Amendment rights. In *Davenport*, the Court upheld a state ban on unions using agency fees of non-union members on political activities absent employees' affirmative approval. 551 U.S. at 182, 188–91. Because unions have no First Amendment right to

collect fees from nonmembers in the first place, the State's limitation on unions' ability to collect those fees merely restricted a state subsidy. *Id*. at 185–87. The Court reasoned that "[w]hat matters is that public-sector agency fees are in the union's possession only because Washington and its union-contracting government agencies"—rather than the self-executing operation of the First Amendment—"have compelled their employees to pay those fees." *Id.* at 187.

Finally, in *Regan*, the Court considered a federal law barring non-profit organizations engaged in lobbying activities from accepting tax-deductible donations. 461 U.S. at 543–44. The Court began by explaining that "tax-deductibility [is] a form of subsidy that is administered through the tax system." *Id*. at 544. It then considered the challenger's argument "that the government may not deny a benefit to a person because he exercises a constitutional right"—there, the right to lobby. *Id.* at 545. The Court rejected that argument, concluding that the government had not denied the challenger's right to lobby because he could still do so; "Congress has merely refused to pay for the lobbying out of public monies." *Id*.

*Ysursa*, *Davenport*, and *Regan* are controlling. As in those cases, SB 954 trims a state subsidy rather than infringes a First Amendment right. The subsidy here takes the form of a state-authorized entitlement allowing employers to reduce their employees' wages to support the employers' favored IAFs. It does not restrict IAFs' right to free speech. ABC-CCC's contrary argument relies on the faulty premise that a state subsidy operates like a one-way ratchet: once California offered wage-crediting for IAFs, the state entitlement became imbued with constitutional protections and could not be restricted. Not so. As

discussed, ABC-CCC's argument flies in the face of the Supreme Court's clear statements to the contrary:

> While [the wage credit] can enhance [ABC-CCC's] exercise of First Amendment rights, [California] is under no obligation to aid [ABC-CCC] in [its expressive] activities. And the State's decision not to do so is not an abridgment of [ABC-CCC's] speech; [it is] free to engage in such speech as [it] see[s] fit.

*Ysursa*, 555 U.S. at 359.

### ii.

We turn next to evaluating whether SB 954 targets certain IAFs based on their open shop advocacy. If it does, then the law is likely subject to strict scrutiny notwithstanding its limitation on a state subsidy rather than a constitutional right. *Rosenberger*, 515 U.S. at 834–35, 837; *Davenport*, 551 U.S. at 189.

"A regulation engages in viewpoint discrimination when it regulates speech 'based on the specific motivating ideology or perspective of the speaker.'" *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1277 (9th Cir. 2017), *cert. denied*, No. 17-1087 (June 28, 2018) (quoting *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015)) (internal quotation marks omitted); *see also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 970 (9th Cir. 2009) ("[V]iewpoint discrimination occurs when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject." (internal quotation marks omitted)). Viewpoint discrimination is the most noxious form of speech suppression. *Rosenberger*, 515 U.S. at 829. By targeting not only "subject matter, but particular views taken by

speakers on a subject," it constitutes "an egregious form of content discrimination." *Id.*

If a law is facially neutral, we will not look beyond its text to investigate a possible viewpoint-discriminatory motive. *See First Resort*, 860 F.3d at 1278 ("'[t]he Supreme Court has held unequivocally that it will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive'" (quoting *Menotti v. City of Seattle*, 409 F.3d 1113, 1130 n.29 (9th Cir. 2005)) (internal quotation marks omitted)). If, however, the law includes indicia of discriminatory motive, we may peel back the legislative text and consider legislative history and other extrinsic evidence to probe the legislature's true intent. *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011) (considering legislative findings where the challenged law favored some entities over others); *cf. Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 87 (1st Cir. 2004) (considering statements by government officials to help determine legislative intent). Two indicia of discriminatory motive relevant here are underinclusiveness and overinclusiveness. *See Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1670 (2015); *Ridley*, 390 F.3d at 87. The presence of either indicates potential viewpoint discrimination, which would prompt us to consider extrinsic evidence to help determine whether the California legislature did, in fact, act with discriminatory intent. *Cf. Ridley*, 390 F.3d at 87–88.

ABC-CCC argues that SB 954 discriminates against organizations that favor open shop arrangements because it "burdens based on the recipient's status and viewpoint." ABC-CCC asserts that "the requirement that prevailing wage contributions be made pursuant to a CBA acts as a proxy for union-backed speech" because unionized employees are unlikely to approve of a wage credit that

benefits an organization whose purpose is pro-open shop advocacy.[15]  As evidence, ABC-CCC claims that SB 954 is overinclusive because it does not allow an employer to take a wage credit for IAF contributions even if an individual employee approves of doing so.  It also argues that the law is underinclusive because it does not require the consent of all unionized employees, and because it leaves in place wage credits for contributions that do not require employee consent—e.g., contributions to pension funds and health insurance plans.

We are unpersuaded.  First, that only unionized employers may have an opportunity to take a credit against their employees' wages for IAF contributions does not facially discriminate against certain *recipients* of that credit: SB 954 is indifferent to which IAFs—if any—employees elect to subsidize.  Second, that unionized employees are unlikely to fund an anti-union IAF over a pro-union one is beside the point: A facially neutral statute restricting expression for a legitimate end is not discriminatory simply because it *affects* some groups more than others.  *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 385 (1992).  That employees may consent to wage deductions only in support of pro-union IAFs merely reflects a choice made by employees, not a mandate imposed by the California legislature.  For example, "an ordinance against outdoor fires" is legitimate even though it might affect anti-government protesters more than pro-government ones

---

[15] Amicus ABC goes a step further, arguing that SB 954 "allow[s] credits for contributions to union [IAFs], while denying the same rights to non-union employers."  But SB 954 does no such thing.  The law allows credits to *any* type of IAF.  The fact that pro-union IAFs may benefit disproportionately is simply a function of employees' decision to spend their money supporting the speech of certain IAFs over others.

because only the former are likely to engage in the expressive activity of flag burning. *Id.*

Our decision in *First Resort* is instructive. There, we considered a city ordinance prohibiting limited services pregnancy centers ("LSPCs") from providing false or misleading statements about their abortion-related services. 860 F.3d at 1267–68. The record included evidence that LSPCs misled women into believing they provided abortion services and "unbiased counseling" when, in fact, they offered no such services and sought to discourage women from getting abortions. *Id.* at 1267–69 (internal quotation marks omitted). First Resort, Inc., an LSPC, challenged the ordinance as discriminating against its anti-abortion views. *Id.* at 1277.

We rejected First Resort's theory. We explained that a law affecting entities holding a particular viewpoint is not viewpoint discriminatory unless it targets those entities *because of* their viewpoint. *Id.* at 1277–78. The ordinance in *First Resort* did not cross that line because it targeted false and deceptive advertising—a legitimate, non-speech-suppressing purpose—and not the views held by LSPCs. *Id.* Indeed, the ordinance in no way limited LSPCs in expressing their anti-abortion views. *Id.*

> Put differently, it may be true that LSPCs engage in false or misleading advertising concerning their services because they hold anti-abortion views. However, the Ordinance does not regulate LSPCs based on any such anti-abortion views. Instead, the Ordinance regulates these entities because of the threat

to women's health posed by their false or misleading advertising.

*Id*. at 1278.

Like the ordinance in *First Resort*, SB 954 targets a legitimate area of state regulation and does not discriminate based on viewpoint. Just as LSPCs remain free to express their anti-abortion views however they wish, SB 954 leaves ABC-CCC and other IAFs—regardless of viewpoint—free to engage in whatever speech they like.

In fact, SB 954 is planted on even firmer constitutional ground than the ordinance in *First Resort* for two reasons. First, whereas the law there regulated the aggrieved party, First Resort, SB 954 does not regulate ABC-CCC or other IAFs *at all*. At most, SB 954 indirectly *affects* ABC-CCC. This fact attenuates any concern that the law targets ABC-CCC's speech. Second, whereas *First Resort* concerned possible infringement of LSPCs' First Amendment rights, SB 954 goes some way toward *remedying* an encumbrance on the First Amendment rights of others—namely, employees on public works projects. Indeed, if ABC-CCC were to prevail here and California's prevailing wage law reverted to its pre-SB 954 state—whereby employers could deduct employee wages to support the employers' favored IAFs without employee consent—the result would likely be an infringement of *employees'* First Amendment right to contribute to causes of *their* choosing. "As Jefferson famously put it, 'to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhor[s] is sinful and tyrannical.'" *Janus*, 138 S. Ct. at 2464 (quoting A Bill for Establishing Religious Freedom, in 2 Papers of Thomas Jefferson 545 (J. Boyd ed. 1950) (emphasis deleted and footnote omitted)).

ABC-CCC also argues that discriminatory motive can be inferred from SB 954's text because, it asserts, the law is over- and underinclusive. A showing that a law regulates a greater or lesser number of entities than is reasonable to serve its objectives could indicate such a motive. *Williams-Yulee*, 135 S. Ct. at 1668.

Whether a law is overinclusive or underinclusive requires first ascertaining the law's declared purpose. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 48–51 (1983) (upholding law restricting access to teacher mailboxes to a particular union because doing so was "compatible with the intended purpose of the property"). SB 954's averred objective is to close a loophole in California's prevailing wage law by requiring collective employee consent before an employer may divert employee wages to IAFs. ABC-CCC argues that SB 954 is overinclusive because it disallows individual employees from agreeing to the IAF wage-credit.

ABC-CCC's argument is unavailing because it loses sight of the law's purpose. SB 954 is part of a larger statutory scheme setting a wage floor for employees on public works projects. The prevailing wage requirement means an employer may not deny an individual employment because she is unwilling to negotiate down a minimum wage and instead hire an employee who is. Allowing individual employees to negotiate wage credits for employers' IAF contributions as ABC-CCC suggests would effectively circumvent this prohibition. Employers could pit prospective employees against each other and hire only those who agreed to take the wage deduction, thereby rendering employee "consent" illusory. That risk is relatively low under a unionized CBA arrangement because employers in that context cannot coerce individual employees into

agreeing to a below-floor wage. Thus, because the legislature did not unreasonably determine that individual employees are not similarly situated to unions in negotiating wage credits, SB 954 is not overinclusive.[16]

A law's underinclusiveness may also indicate viewpoint discrimination.[17] "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 802 (2011). But while a "law's underinclusivity raises a red flag, the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Williams-Yulee*, 135 S. Ct. at 1668 (quoting *R.A.V.,* 505 U.S. at 387) (internal quotation marks omitted). "A State need not address all aspects of a

---

[16] At any rate, SB 954 does nothing to bar individual employees from contributing to ABC-CCC or any other IAF. Just as restricting automatic payroll deductions does not infringe unions' free speech rights, *Ysursa*, 555 U.S. at 360–61, neither does limiting a wage deduction infringe IAFs' free speech rights.

[17] ABC-CCC argues that the Court's recent decision in *National Institute of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) supports its position that SB 954 discriminates based on viewpoint. *National Institute* invalidated a California law compelling medical clinics to post information about State-provided reproductive services. *Id*. at 2376. ABC-CCC observes that *National Institute* criticized the law as underinclusive because it applied only to certain clinics and not to others providing some of the same reproductive services. *Id.* at 2375–76. ABC-CCC's reliance on *National Institute* is misplaced. First, *National Institute* expressly did not reach the issue of viewpoint discrimination. *Id.* at 2370 n.2. Second, the law there was underinclusive because exempting some clinics from the information requirement fit poorly with its objective of "providing low-income women with information about state-sponsored services." *Id.* at 2375. As we explain, SB 954 is, by contrast, reasonably tailored to the objective of ensuring that employer credits taken against employee wages inure to the benefit of employees.

problem in one fell swoop; policymakers may focus on their most pressing concerns. We have accordingly upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service of their stated interests." *Id.*

ABC-CCC argues that SB 954 is underinclusive because it (1) fails to ensure *all* employees' consent and (2) does not require employee consent for wage credits related to pension plans, health insurance, and other statutorily-enumerated employee benefit programs. ABC-CCC's arguments are unpersuasive. First, although SB 954 does not require the unanimous consent of all employees, it certainly ensures a greater degree of consent than if employers could—as they were doing—freely reduce employees' wages without *any* form of employee consent. Thus, while SB 954 might not "address all aspects of a problem," it at least addresses lawmakers' "most pressing concerns." *Id*. Moreover, the fact that some employees may disapprove of their union's decision not to agree to a wage deduction in support of a particular IAF simply reflects the inherently representative nature of unions. As with any representative arrangement, if a majority of employees disagrees with the outcome of a negotiated CBA, they can vote for a new union representative or dump the union entirely.

Second, the notion that deductions for pension plans and the like must be subject to the same consent requirement fails to account for SB 954's declared purpose. *See id*. Pension plans, training programs, and worker assistance programs all share a common denominator: they directly benefit employees. Allowing wage credits for those programs is therefore reasonably tailored to the purpose of the prevailing wage law: setting a compensation floor for employee pay. IAFs like ABC-CCC, by contrast, focus not on programs

directly benefitting employees, but on public policy advocacy and, as ABC-CCC puts it, "precedential issues of importance to the construction industry." To that end, ABC-CCC spends funds on distributing mailers to voters, underwriting academic articles, providing testimony to governmental bodies, and hosting seminars for contractors that promote open shop employment arrangements. These activities, which are geared at promoting the interests of the construction industry, have only an attenuated relationship to employee interests. Treating IAFs differently from employee-focused programs therefore makes sense in light of the objectives of California's prevailing wage law. Accordingly, requiring employee consent for IAF contributions and not others fits snugly with SB 954's purpose and is not underinclusive.[18]

---

[18] Because SB 954 is neutral on its face, we do not proceed to consider ABC-CCC's argument that the legislative record reveals a discriminatory motive. *First Resort*, 860 F.3d at 1278. But we observe that even if we did go the distance, we do not discern a pro-union motivation by the California legislature in the legislative record. The record shows that proponents of SB 954 in the legislature were intent on closing a loophole allowing employers to take a wage credit without their employees' consent. For example, an analysis by the Senate Rules Committee states that the bill would

> revise[] the definition of acceptable employer payments toward benefits, and thus what counts as payment of the prevailing wage. The author feels that the current broad definition of these employer payments allows non-union employees who are not party to a CBA to have part of their wages deducted for industry advancement purposes. As such, employers can deduct and use these wages without the input or consent of the employees or their labor representatives.

**V.**

"Given that [SB 954 does] not infringe[] [ABC-CCC's] First Amendment rights, the State need only demonstrate a rational basis to justify the ban on [wage-crediting IAF contributions]." *Ysursa*, 555 U.S. at 359. SB 954 easily clears this low bar. California has a legitimate interest in enacting a prevailing wage law to protect its workers, and SB 954 is rationally related to that purpose because it prevents employers from deducting their employees' wages to support the employers' preferred IAFs absent their employees' collective consent. Because workers have greater negotiating power when bargaining collectively, California's decision to allow such wage-crediting only for IAF contributions made pursuant to a CBA is "plainly reasonable." *See id.* at 360.

**VI.**

Finally, we address ABC-CCC's equal protection claim. "Article III requires 'a plaintiff [to] demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" *Or. Prescription Drug Monitoring Program v. U.S. Drug Enf't Admin.*, 860 F.3d 1228, 1233 (9th Cir. 2017) (alteration in original) (quoting *Davis*, 554 U.S. at 734). Thus, ABC-CCC's standing to pursue its First Amendment claim is not determinative of its standing for all purposes, and we must independently assess its standing to bring an equal protection challenge.

---

The legislature's concern with employers reducing their employees' wages for industry advancement purposes does not plausibly reflect a discriminatory motive. To the contrary, it supports the State's averred objective of closing a loophole in the law's employee consent provision.

ABC-CCC argues that it has standing because, "[b]y permitting some [IAFs] to obtain prevailing wage payments, but not others, SB 954 discriminates against funds like ABC-CCC." ABC-CCC's argument flows from the same flawed premise anchoring its First Amendment claim: a perceived right to "obtain" funding. As discussed in Part IV.A, *supra*, however, such a right is alien to the First Amendment. To have standing to press its equal protection claim, ABC-CCC must instead show that the law deprives it of some cognizable fundamental right guaranteed to other similarly situated entities. *See, e.g.*, *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (noting that equal protection claims derive from a discriminatory policy that impairs the rights of one entity vis-à-vis another); *Sang Yoon Kim v. Holder*, 603 F.3d 1100, 1104 (9th Cir. 2010) (noting that the party bringing the equal protection claim must "belong to the class of [entities] who are allegedly similarly situated to" the party). But SB 954 neither regulates IAFs nor treats certain IAFs differently. The law applies to employers, and so ABC-CCC cannot show that SB 954 causes an equal protection injury *to itself*.[19] We therefore agree with the district court that ABC-CCC lacks standing to press its equal protection claim.

## CONCLUSION

SB 954 does not frustrate the objectives of the NLRA and is not preempted under the *Machinists* doctrine. By setting a floor for employee pay while allowing unionized

---

[19] Interpipe might have standing to bring an equal protection claim based on SB 954's disparate treatment of unionized employers, but Interpipe brings no such claim.

employees to opt-out of a particular provision, California has acted well within the ambit of its traditional police powers.

SB 954 also does not violate ABC-CCC's alleged First Amendment rights.  Contrary to its assertion, ABC-CCC has no free-floating First Amendment right to "amass" funds to finance its speech.  And to the extent SB 954 implicates ABC-CCC's speech interests at all, those interests are not constitutional in nature because SB 954 merely trims a state subsidy of speech, and does so in a viewpoint-neutral way. The law is therefore subject to rational basis review.  Under that lenient standard, because SB 954 is rationally related to a legitimate government purpose—ensuring meaningful employee consent before employers contribute portions of their wages to third-party advocacy groups—it easily withstands scrutiny.

**AFFIRMED.**